IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 7, 2003 Session

## STEVEN D. ELLIOTT v. GINGER W. ELLIOTT (ECTON)

**Appeal from the Circuit Court for Davidson County**
**No. 00D-2375     Muriel Robinson, Judge**

---

**No. M2003-00492-COA-R3-CV - Filed April 8, 2004**

---

This appeal involves a post-divorce dispute regarding stock options that were part of the marital estate. The Circuit Court for Davidson County approved a marital dissolution agreement in which the husband agreed to transfer one-half of his employee stock options to the wife as part of the division of the martial estate. After the husband's employer and the employer's brokerage firm declined to transfer the stock options to the wife, she orally requested the husband to exercise the options on her behalf. The value of the employer's stock fell after the husband did not exercise the options. The wife sought to hold the husband in contempt or to modify the divorce decree. The trial court declined to hold the husband in contempt but found that he had impermissibly impeded the division of the martial estate. Accordingly, the court awarded the wife $59,759.25, the stock options' before-tax value had they been exercised on the day the divorce decree was entered. In addition, the court ordered the husband to immediately sell the options originally awarded to the wife and to pay her the proceeds as a credit against the judgment. The court also ordered the husband to pay the wife's attorney's fees, as well as prejudgment interest. The husband has appealed. We have determined that the trial court properly concluded that the husband unreasonably impeded the wife's acquisition of the value of the stock options. However, we have determined that the trial court erred by valuing the stock options as of the time of the divorce rather than the time the wife and the husband orally agreed to exercise the options and that the court erred by requiring the husband to exercise his options to pay the judgment. We have also determined that the court erred by awarding the wife prejudgment interest but properly awarded the wife her attorney's fees.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part; Modified in Part; and Remanded

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which WILLIAM B. CAIN and FRANK G. CLEMENT, JR., JJ., joined.

Markley Runyon Gill, Erin, Tennessee, for the appellant, Steven D. Elliott.

Jeffrey L. Levy, Nashville, Tennessee, for the appellee, Ginger W. Ecton.

# OPINION

## I.

On April 10, 2001, Steven D. Elliott and Ginger W. Elliott, now Ecton, executed a marital dissolution agreement ("MDA") as part of their divorce proceeding pending in Circuit Court for Davidson County. Under the terms of this MDA, Mr. Elliott, then a manager at The Home Depot ("Home Depot"), agreed to transfer one-half of the stock options he had earned during the marriage to Ms. Ecton. The MDA specified the division as follows:

| 1997 Options | $11.33 per share | 1050 to Wife | 1050 to Husband |
| 1998 Options | $21.29 per share | 675 to Wife | 675 to Husband |
| 1999 Options | $37.92 per share | 300 to Wife | 300 to Husband |
| 2000 Options | $53.00 per share | 100 to Wife | 100 to Husband |

The trial court approved the MDA and incorporated it into the final divorce decree that was entered on April 27, 2001. Had Ms. Ecton exercised these options on the day the divorce decree was entered, they would have generated $59,759.25 before taxes.

The MDA did not specify how Mr. Elliott would transfer the options to Ms. Ecton, although it did require both parties to undertake all further acts necessary to carry out the purposes and intent of the MDA. At the time of the divorce, both Ms. Ecton and Mr. Elliott thought that he could simply place the options in Ms. Ecton's name or that Ms. Ecton could simply call Mr. Elliott to exercise the options whenever she was ready. The MDA did not allocate the tax burden for the exercise of the options, but the parties' understanding was that they would bear the tax consequences for the exercise of their own options.[1]

The parties later discovered that Home Depot's employee stock option plan would not permit Mr. Elliott to transfer one-half of his stock options to Ms. Ecton. Accordingly, Ms. Ecton's lawyer prepared a qualified domestic relations order or "QDRO" under the Retirement Equity Act of 1984, Pub. L. 98-397, 98 Stat. 1426 ("REA"). The REA permits the assignment of pension plan benefits to non-plan participants if done pursuant to a QDRO. The QDRO reiterated the division of the stock options contained in the MDA and specifically provided that Ms. Ecton rather than Mr. Elliott would be liable for the taxes arising from the exercise of her half of the options.

The trial court signed and entered the QDRO on January 14, 2002, but both Home Depot and its broker of record, Smith Barney, refused to honor it. Because Mr. Elliott's stock options were not part of a retirement plan, Home Depot and Smith Barney concluded that they could not be transferred under a QDRO. Moreover, under Home Depot's employee stock option plan, Mr. Elliott could not

---

[1]The MDA specifically assigned Mr. Elliott responsibility for the taxes on the options he exercised after the parties' separation but prior to the entry of the MDA.

transfer his options to any non-employee, including Ms. Ecton.[2] Thus, Home Depot and Smith Barney advised Ms. Ecton that the only way she could receive the benefit of the options Mr. Elliott agreed to transfer to her in the MDA was for Mr. Elliott to exercise the options himself and transfer the proceeds to her.[3]

Shortly thereafter, Ms. Ecton met with a financial advisor to discuss her finances. The financial advisor told Ms. Ecton that the market price for Home Depot stock was relatively high and recommended that she exercise the options Mr. Elliott agreed to transfer to her in the MDA. At the time, Ms. Ecton had not spoken with Mr. Elliott since the parties' divorce. Nevertheless, the following day, February 13, 2002, Ms. Ecton telephoned Mr. Elliott.

During this telephone conversation, Ms. Ecton told Mr. Elliott what her financial advisor had said and that Home Depot and Smith Barney had refused to honor the QDRO. She also told him that Home Depot and Smith Barney had informed her that the only way she could realize the value of the options was for Mr. Elliott to exercise them and transfer the proceeds to her. Ms. Ecton instructed Mr. Elliott to exercise the options and agreed to pay the resulting tax liability. Ms. Ecton said her tax advisor estimated the tax liability to be 23% and told Mr. Elliott that he could deduct that amount from the proceeds and give her the remainder.

Mr. Elliott agreed to exercise the options and transfer the proceeds to her. Mr. Elliott said he believed the tax liability would be closer to 30% and that he wanted to check with his own financial advisor to determine the amount he needed to withhold to cover the tax liability. Mr. Elliott also agreed to exercise and give Ms. Ecton the proceeds from 100 of his own 1997 options, and in return he was going to keep Ms. Ecton's 100 2000 options which could not be exercised then because the market price was currently higher than the option price. Had Mr. Elliott done what he agreed to do, Ms. Ecton would have realized $68,113.25 before taxes from the exercise of the stock options.

There is no evidence in the record that Mr. Elliott did, in fact, speak with a financial advisor regarding the tax liability he would incur from the exercise of Ms. Ecton's options. Instead, Mr. Elliott apparently contacted his attorney who told him that he was free to renege on his agreement. At that point, Mr. Elliott decided that he was not going to exercise Ms. Ecton's options as agreed. He did not, however, inform Ms. Ecton of his decision. Instead, on February 27, 2002, two weeks after his conversation with Ms. Ecton, Mr. Elliott exercised 1,225 of his own Home Depot stock options but none of the 2,125 options he had agreed to exercise for Ms. Ecton. Mr. Elliott realized a profit of $37,572.26 before taxes.

---

[2]Counsel for the parties failed to include Home Depot's employee stock option plan in the record on appeal. It is unclear from the record whether the plan was ever produced to the trial court or, for that matter, whether the parties' counsel in the divorce proceeding ever consulted it. In any event, it is clear from the record on appeal that whatever else the plan says, it barred the transfer of options awarded under the plan to individuals like Ms. Ecton who were not employed by Home Depot.

[3]Under Home Depot's employee stock option plan, the exercise of the options and the sale of the resulting shares occurs simultaneously, and the employee receives the difference between the option price and the day's market price for the stock.

Mr. Elliott did not tell Ms. Ecton that he had decided to renege on their agreement until four to six weeks later when Ms. Ecton called to inquire about the exercise of the options. Further attempts by Ms. Ecton and her attorney to obtain the cooperation of Mr. Elliott and his attorney to exercise Ms. Ecton's options proved futile. Thus, on July 17, 2002, Ms. Ecton filed a petition to have Mr. Elliott held in contempt or in the alternative to modify the divorce decree.

The trial court held a hearing on Ms. Ecton's petition on January 9, 2003. Both Mr. Elliott and Ms. Ecton testified, and several exhibits were admitted into evidence. On February 10, 2003, the trial court entered a written order declining to hold Mr. Elliott in contempt. The trial court did, however, grant the petition to modify the original divorce decree. The trial court found that February 13, 2002 was "the date in which the Respondent [Mr. Elliott] first agreed to exercise the options and turn over the money to the Petitioner [Ms. Ecton]." The trial court explained that Mr. Elliott "then changed his mind and failed to exercise the options resulting in this lawsuit to enforce the provisions of the Final Decree of Divorce." The trial court concluded that Mr. Elliott had impermissibly impeded the transfer of the cash value of the stock options to Ms. Ecton by not exercising the Home Depot options in a timely manner and that Mr. Elliott had been an impediment to the division of the marital assets. The trial court entered a judgment in favor of Ms. Ecton for $59,759.25, the sum the options would have generated had they been exercised the day the original divorce decree was entered. The trial court ordered Mr. Elliott to pay Ms. Ecton's attorneys' fees in the amount of $1,776.07 and held that the judgment would accrue interest at the rate of 10% running from the date Mr. Elliott orally agreed to exercise the options. Mr. Elliott appealed.[4]

## II.
### THE STANDARD OF REVIEW

The standards this court uses to review the results of bench trials is well settled. With regard to a trial court's findings of fact, we will review the record *de novo* and will presume that the findings of fact are correct unless the preponderance of the evidence is otherwise. We will also give great weight to a trial court's factual findings that rest on determinations of credibility. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997); *B & G Constr., Inc. v. Polk*, 37 S.W.3d 462, 465 (Tenn. Ct. App. 2000). However, if the trial judge has not made a specific finding of fact on a particular matter, we will review the record to determine where the preponderance of the evidence lies without employing a presumption of correctness. *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997).

Reviewing findings of fact under Tenn. R. App. P. 13(d) requires an appellate court to weigh the evidence to determine in which party's favor the weight of the aggregated evidence falls. There is a reasonable probability that a proposition is true when there is more evidence in its favor than

---

[4]The trial court also ordered Mr. Elliott to exercise all of Ms. Ecton's shares for her immediately, with the proceeds to constitute a reduction in the judgment, and ordered Ms. Ecton to pay the taxes arising from the exercise of the options. In addition, the trial court mandated that the judgment against Mr. Elliott would constitute a lien against all of his property, including wages, retirement accounts, personal accounts, personal property, real property and automobiles. Mr. Elliott does not specifically challenge these remedies on appeal apart from his attack on the underlying judgment in general.

there is against it. Thus, the prevailing party is the one in whose favor the evidentiary scale tips, no matter how slightly. *Parks Props. v. Maury County*, 70 S.W.3d 735, 741 (Tenn. Ct. App. 2001); *Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999).

Tenn. R. App. P. 13(d)'s presumption of correctness requires appellate courts to defer to a trial court's findings of fact. *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001). Because of the presumption, an appellate court is bound to leave a trial court's finding of fact undisturbed unless it determines that the aggregate weight of the evidence demonstrates that a finding of fact other than the one found by the trial court is more probably true. *Parks Props. v. Maury County*, 70 S.W.3d at 742. For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000).

The presumption of correctness in Tenn. R. App. P. 13(d) applies only to findings of fact and not to conclusions of law. Accordingly, appellate courts review a trial court's resolution of legal issues without a presumption of correctness and reach their own independent conclusions regarding these issues. *Johnson v. Johnson*, 37 S.W.3d 892, 894 (Tenn. 2001); *Nutt v. Champion Int'l Corp.*, 980 S.W.2d 365, 367 (Tenn. 1998).

### III.
#### THE EMPLOYEE STOCK OPTIONS

Mr. Elliott argues the trial court erred in concluding that he impermissibly impeded the distribution of the marital assets. According to Mr. Elliott, all he agreed to do in the MDA with respect to the stock options was to sign paperwork transferring the options to Ms. Ecton. He asserts that since Ms. Ecton never presented him with paperwork he could sign to transfer the options over to her, he has not violated the terms of the MDA, and therefore, he did not impede the division of the marital assets. This argument borders on the disingenuous.

#### A.

An MDA's provisions pertaining to the division of the parties' marital estate are essentially contractual, even after they have been judicially approved and incorporated into a divorce decree. *Johnson v. Johnson*, 37 S.W.3d at 896; *Wade v. Wade*, 115 S.W.3d 917, 924 (Tenn. Ct. App. 2002); *Gray v. Estate of Gray*, 993 S.W.2d 59, 63 (Tenn. Ct. App. 1998). The parties may not unilaterally modify an MDA once it has been approved by the trial court. *Johnson v. Johnson*, 37 S.W.3d at 895. In fact, both parties obtain a vested interest in the property allocated to them in the MDA, and neither party may frustrate the other's receipt of his or her vested interest. *Johnson v. Johnson*, 37 S.W.3d at 897.

The portions of an MDA that remain contractual after the trial court has approved them should be construed and enforced like other contracts. *Bogan v. Bogan*, 60 S.W.3d 721, 730 (Tenn. 2001); *Gray v. Estate of Gray*, 993 S.W.2d at 63. Thus, our goal is to ascertain and give effect to the parties' intentions. *Ahern v. Ahern*, 15 S.W.3d 73, 81 (Tenn. 2000). Our search for the parties' intentions must focus on the MDA itself. Each provision of an MDA should be construed in light

of the entire MDA, and the language in these provisions should be given its natural and ordinary meaning. We should construe MDAs fairly and reasonably, and we should avoid rewriting these agreements under the guise of "construing" them. *Duvier v. Duvier*, No. 01A01-9311-CH-00506, 1995 WL 422465, at *3 (Tenn. Ct. App. July 19, 1995) (No Tenn. R. App. P. 11 application filed).

Every contract imposes upon the parties a duty of good faith and fair dealing in the performance and interpretation of the contract. *Wallace v. National Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996); RESTATEMENT (SECOND) OF CONTRACTS § 205 (1979); 2 JOSEPH M. PERILLO & HELEN HADJIYAUUAKIS BENDER, CORBIN ON CONTRACTS § 5.27, at 139 (rev. ed. 1995). This duty requires a contracting party to do nothing that will have the effect of impairing or destroying the rights of the other party to receive the benefits of the contract. *Winfree v. Educators Credit Union*, 900 S.W.2d 285, 289 (Tenn. Ct. App. 1995). The provisions of an MDA that retain their contractual character following the entry of a final divorce decree carry with them this duty of good faith and fair dealing. *Hilman v. Hilman*, No. M2002-00898-COA-R3-CV, 2003 WL 21766254, at *3 (Tenn. Ct. App. July 31, 2003) (No Tenn. R. App. P. 11 application filed).

**B.**

There is no dispute regarding the nature of the property division that the parties intended in this case. The MDA clearly reflects that Mr. Elliott voluntarily agreed to transfer one-half of his Home Depot employee stock options to Ms. Ecton, and Ms. Ecton voluntarily agreed to accept these stock options in lieu of cash.[5] The parties anticipated that following their divorce, Ms. Ecton would obtain and exercise complete control over the options she received in the divorce decree.

If there was any uncertainty, it involved the mechanism by which the stock options would be transferred to Ms. Ecton. When the parties were negotiating the MDA, they apparently believed that Mr. Elliott could simply sign over the stock options to Ms. Ecton. They later learned that the transfer process was not that simple. Specifically, Home Depot and Smith Barney informed them that Mr. Elliott could not sign over the stock options to Ms. Ecton and that they would not recognize a QDRO. Thus, by early 2002 at the latest, the parties knew or should have known: (1) that the stock options themselves could not be transferred to Ms. Ecton at all regardless of the paperwork presented to Home Depot or Smith Barney; and (2) that the only way that Ms. Ecton could obtain the benefit of the stock options was for Mr. Elliott to exercise the options himself and then transfer the proceeds to her. Ms. Ecton communicated this information to Mr. Elliott.

Once the parties discovered that the mechanism chosen by their attorneys to transfer the stock options had failed, they were obligated to deal with each other fairly and in good faith to effectuate

---

[5]The parties could very easily have agreed to accomplish the division of the stock options by requiring Mr. Elliott to exercise half of the options immediately and pay the proceeds over to Ms. Ecton. However, Ms. Ecton apparently decided that these stock options would increase in value over time and, therefore, that she would be better served by obtaining the options rather than the cash. It is perfectly permissible for divorcing parties to make this sort of investment decision. However, like any other investment, they do so with the understanding that stock, stock options, and other investments cannot only increase but also decrease in value over time. When Ms. Ecton decided to accept the stock options rather than cash, she assumed the risk that the value of these options could decrease before she exercised them.

-6-

the intent of the MDA. Initially, both parties acted in good faith. During a February 13, 2002 telephone call, Ms. Ecton unequivocally instructed Mr. Elliott to exercise the options awarded to her in the MDA and offered to pay any tax liability he incurred as a result. Mr. Elliott agreed to comply with her request.[6]

Subsequently, Mr. Elliott, apparently acting on the advice of his attorney, decided not to exercise Ms. Ecton's options. His decision to renege on the oral agreement without informing Ms. Ecton of his decision until a much later date constitutes a breach of the parties' February 13, 2002 oral agreement, as well as a breach of his duty of good faith and fair dealing under the original MDA. The fact that Mr. Elliott may have viewed his conduct as justified is irrelevant because "[s]ubterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified." RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. d. We therefore affirm the trial court's conclusion that Mr. Elliott impermissibly impeded the division of the marital estate and that Ms. Ecton was entitled to recover damages as a result.

Although we are upholding the trial court's conclusion that Mr. Elliott impermissibly impeded the division of the marital estate, we note that both parties in this case were caught in a legal quagmire resulting primarily from their lawyers' failure to do adequate research in devising the original MDA. At the time the parties entered into the MDA, the complexities inherent in structuring the division of a marital estate composed in part of employee stock options had already been addressed in the legal literature and in case law from other jurisdictions.[7] The legal literature and case law addressing these problems have only grown since that time.[8] The parties' attorneys should have consulted the Home Depot employee stock option plan and structured the MDA accordingly. If, as it appears from the record on appeal, there was no way to structure the MDA to transfer the stock options themselves to Ms. Ecton, the parties' attorneys should have included in

---

[6]This would be a very different case had Mr. Elliott informed Ms. Ecton on February 13, 2002 that he was unwilling to exercise the options unless Ms. Ecton put her request in writing. But, as the trial court specifically found, Mr. Elliott accepted Ms. Ecton's oral offer by agreeing to exercise the options and to transfer the proceeds to her. We cannot reverse the trial court's factual finding in this regard unless we determine that the evidence preponderates against it. We have conducted an independent review of the record on appeal and conclude that there was ample evidence in the record to support the trial court's finding of an oral agreement. Although there was some uncertainty as to how much the taxes would be, the essential terms of the agreement were in place. This agreement was enforceable, and Mr. Elliott should have exercised the options as he agreed and retained the money necessary to pay the taxes.

[7]*E.g.*, Andrew C. Littman, *Valuation and Division of Employee Stock Options in Divorce*, 29 Colo. Law. 61 (May 2000); Lynn Curtis, *Valuation of Stock Options in Dividing Marital Property Upon Dissolution*, 15 J. Am. Acad. Matrim. Law. 411 (1998). For a discussion of the case law, see Eric Hollowell, Annotation, *Divorce and Separation: Treatment of Stock Options for Purposes of Dividing Marital Property*, 46 A.L.R.4th 640 (1986 & Supp. 2003); Eric Hollowell, Annotation, *Valuation of Stock Options for Purposes of Divorce Court's Property Distribution*, 46 A.L.R.4th 689 (1986 & Supp. 2003).

[8]*E.g.*, Charles P. Kindregan, Jr. & Patricia A. Kindregan, *Unexercised Stock Options and Marital Dissolution*, 34 Suffolk U. L. Rev. 227 (2001); Tracy A. Thomas, *The New Marital Property of Employee Stock Options*, 35 Fam. L.Q. 497 (Fall 2001); Brett R. Turner, *Equitable Distribution of Stock Options*, 19 Equitable Distribution J. 133 (Dec. 2002); Laura W. Morgan, *Distribution of Employee Stock Options*, 15 Divorce Litig. 17 (Jan. 2003); David S. Rosettenstein, *Options on Divorce: Taxation, Compensation Accountability, and the Need to Look for Holistic Solutions*, 37 Fam. L.Q. 203 (Summer 2003).

the MDA specific provisions governing the exercise of the options, transfer of the proceeds, and payment of the resulting taxes. These provisions would presumably have included procedural safeguards – e.g., a requirement that any instruction to exercise options be in writing, specify which and how many of the options were to be exercised and when, and be delivered by certified mail – to protect the parties from the very eventualities that gave rise to this case.[9]

### C.

Next, we turn to Ms. Ecton's argument that the trial court erred in measuring her damages. We agree with Ms. Ecton's argument that the damages should have been measured from the date Mr. Elliott agreed to exercise the options, not the date of the divorce decree. The undisputed evidence in the record shows that had Mr. Elliott exercised Ms. Ecton's options on February 13, 2002 as he promised, the net proceeds before taxes would have been $68,113.25. However, as the parties agreed, this amount would have been reduced by whatever taxes Mr. Elliott became liable to pay as a result of the exercise of the options.

The trial court should have awarded Ms. Ecton a judgment for $68,113.25 minus the amount of taxes Mr. Elliott can show he would have had to pay had he exercised the options as he agreed. The record does not reveal how much the taxes would have been, and therefore, we must remand the case for a recalculation of the damages award.

We have also concluded that the trial court erred by ordering Mr. Elliott to exercise the stock options. By the time the trial court ordered Mr. Elliott to exercise his stock options, their value had decreased substantially compared to their value on April 27, 2001 (the entry of the final divorce decree) or February 13, 2002 (the date of the parties' oral agreement to exercise the options). By demanding a cash settlement, Ms. Ecton had relinquished her claim to these stock options for their investment value. While these options may, as a practical matter, have been Mr. Elliott's only source of funds to pay the judgment, the trial court should have left the decision whether or not to exercise the options to Mr. Elliott. It would have been appropriate for Mr. Elliott to retain the stock options as investments and obtain the funds to pay the judgment from other sources.

### IV.
#### THE ATTORNEY'S FEES AND PREJUDGMENT INTEREST

The trial court also ordered Mr. Elliott to pay Ms. Ecton prejudgment interest and $1,776.07 in attorney's fees. Mr. Elliott has taken issue with the award of attorney's fees. While he has not explicitly taken issue with the award of prejudgment interest, we have decided to address this issue pursuant to Tenn. R. App. P. 13(b). We have determined that the trial court erred by awarding Ms. Ecton prejudgment interest but that the trial court properly awarded Ms. Ecton her attorney's fees.

Awarding prejudgment interest is a discretionary matter. *Spencer v. A-1 Crane Serv., Inc.*, 880 S.W.2d 938, 944 (Tenn. 1994); *Stooksbury v. American Nat'l Prop. & Cas. Co.*, 126 S.W.3d

---

[9]It is also possible that the parties, had they been informed by their lawyers of the practical difficulties associated with splitting the stock options in the MDA, might have chosen to structure the property division in some other manner.

505, 521 (Tenn. Ct. App. 2003). Courts need not award prejudgment interest to every prevailing party but should award prejudgment interest when it is fair, given the particular circumstances of the case. *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998); *O'Leary v. Johnson*, 84 S.W.3d 584, 589 (Tenn. Ct. App. 2002). Prejudgment interest need not be awarded to a party who has been dilatory in pursuing a claim or who has delayed the proceeding. *Christmas Lumber Co. v. Valiga*, 99 S.W.3d 585, 596 (Tenn. Ct. App. 2002); *Scholz v. S. B. Int'l, Inc.*, 40 S.W.3d 78, 83 (Tenn. Ct. App. 2000).

Both parties were attempting to end their marriage as amicably as possible when they were negotiating their MDA. The imbroglio in which they found themselves in late 2001 and early 2002 was their attorneys' making, not theirs. When they learned that something was amiss, they should likewise have cooperated to resolve the problem. However, amicable dealings and cooperation are frequently not part of post-divorce relationships. With this reality in mind, Ms. Ecton and her attorney should have realized that the ball was in their court when the problem with her stock options manifested itself. They should have quickly obtained another enforceable written agreement with Mr. Elliott regarding the options or returned to court to obtain a modification of the divorce decree to correct the problem.

A supplemental oral agreement is not an advisable way to modify a marital dissolution agreement. The existence of these agreements can be too easily disputed, and the terms of these agreements can be difficult to prove.[10] Thus, Ms. Ecton should have given Mr. Elliott written instructions to sell her share of the stock options and should have insisted on written confirmation of the transaction. She should not have waited approximately five months before she sought judicial relief, and it should not have taken another six months for the trial court to address the matter. During this entire time, both Mr. Elliott and Ms. Ecton bore the risk that the value of the stock options would change. By the time the trial court addressed the problem, the value of the stock options was significantly less than the value in February 2002. Under these circumstances, awarding Ms. Ecton prejudgment interest from February 13, 2002 was unfair, and therefore, we vacate that portion of the judgment.

As a general matter, litigants are expected to be responsible for their own attorney's fees in the absence of a statute or contractual provision otherwise. *John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d 528, 534 (Tenn. 1998); *Massachusetts Mut. Life Ins. Co. v. Jefferson*, 104 S.W.3d 13, 33 (Tenn. Ct. App. 2002). In domestic relations cases, three of the most common circumstances in which attorney's fees are appropriate include: (1) awards to economically disadvantaged spouses as additional spousal support in divorce proceedings;[11] (2) awards to spouses who must return to

---

[10]The difficulty of proof can be a two-edged sword. Parties like Ms. Ecton could have difficulty proving the existence of an oral agreement if the other party denies its existence. Similarly, parties like Mr. Elliott who act in good faith based on oral instructions to exercise stock options may find themselves at risk if the other party later denies that he or she asked for the options to be exercised.

[11]*E.g., Smith v. Smith*, 912 S.W.2d 155, 161 (Tenn. Ct. App. 1995); *Brown v. Brown*, 913 S.W.2d 163, 170 (Tenn. Ct. App. 1994).

court to enforce child support obligations;[12] and (3) awards to spouses seeking to enforce an MDA when the MDA contains a provision for attorney's fees.

Paragraph XIX of the MDA explicitly entitles either party to recover his or her "reasonable expenses including attorney fees" if "it becomes reasonably necessary for either party to institute legal proceedings to procure the enforcement of any provisions of . . . [the MDA]." Based on the correspondence in May and June 2002 from Mr. Elliott's attorney, we find, as did the trial court, that Ms. Ecton was left with no option other than to seek judicial assistance in obtaining the benefit of her agreement embodied in the MDA. Accordingly, the trial court properly awarded Ms. Ecton $1,776.07 in legal expenses.

## V.

We affirm the trial court's determination that Mr. Elliott impeded the division of the marital estate by breaching the parties' February 13, 2002 agreement to exercise the stock options allocated to Ms. Ecton in the MDA. However, we modify the judgment to award Ms. Ecton $68,113.25 less Mr. Elliott's tax liability for this sale and remand the case to the trial court to ascertain the amount of Mr. Elliott's tax liability and for any other proceedings that may be required. We vacate the award of prejudgment interest. In addition, we affirm the award of the attorney's fees Ms. Ecton incurred in the trial court, but we deny her request for additional attorney's fees for this appeal. We tax the costs of this appeal to Steven D. Elliott and his surety for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., P.J., M.S.

---

[12]Tenn. Code Ann. § 36-5-103(c) (2001).