IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 4, 2007 Session

# LINDA JEAN COOK (RAMSEY) v. LARRY DEAN COOK

Appeal from the Chancery Court for Jefferson County
No. 93-212    Ben W. Hooper, II, Judge, Sitting by Interchange

No. E2007-00750-COA-R3-CV
Filed February 29, 2008

In this post-divorce action, Linda Jean Cook (Ramsey) ("Wife") requested the Trial Court to order her ex-husband, Larry Dean Cook, ("Husband") to execute a Qualified Domestic Relations Order ("QDRO") dividing his retirement plan according to the Property Settlement Agreement incorporated into the parties' divorce decree more than ten years ago. The parties had previously drafted – and the Trial Court approved – several QDROs that were rejected by the plan's administrator. Wife maintained that she was supposed to receive her one-third of the plan in shares of stock, which had appreciated considerably since the divorce. Husband asserted that Wife was entitled to a specific dollar amount instead. Following a trial, the Trial Court found that Wife's portion of the plan was one-third of the cash value of the plan at the time of the divorce, and then awarded her an additional six-percent interest, for a total of $46,184.27. We find no error in the Trial Court's judgment, and we affirm.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed;
Case Remanded

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., joined. CHARLES D. SUSANO, JR., J., filed a dissenting opinion.

Denise Terry Stapleton, Morristown, Tennessee, for the Appellant, Linda Jean Cook (Ramsey).

P. Richard Talley and Christopher D. Brown, Dandridge, Tennessee, for the Appellee, Larry Dean Cook.

**OPINION**

## I. Background

This case arises from the dissolution of a 28-year marriage. After living apart for the last seven years of their marriage, Wife filed for divorce from Husband. The parties entered into a Property Settlement Agreement ("MDA")[1] dividing their assets and providing for Husband to pay the costs of Wife's health insurance and attorney fees incurred in the divorce action. Husband and Wife signed the MDA on October 22, 1993. On that same day, the Trial Court entered a Judgment granting Wife a divorce and incorporating the MDA into the Judgment. The Judgment was signed by the Trial Judge, Wife, Husband, and counsel for both parties.

The MDA contained a provision that awarded Wife one-third of Husband's First Tennessee National Corporation Savings Plan ("the Plan") and required both parties to execute a QDRO so that the administrator of the Plan could distribute Wife's portion of the Plan to her. The MDA specified the following division of the Plan:

> 3. Savings Plan:
>
> That the wife shall receive from the Husband's First Tennessee National Corporation Savings and Trust Plan (hereinafter called Plan) one-third (1/3) of this Plan at First Tennessee Bank, National Association. Husband will execute an assignment assigning his one-third (1/3) in the Plan to wife.
>
> a. The parties acknowledge that certain interests of the husband, Larry Edwin Cook, . . . in the Plan through First Tennessee Bank, National Association . . . is marital property and the wife, Linda Jean Rhyne Cook, is entitled to a one-third (1/3) share in the subject the Plan [sic] belonging to Larry Edwin Cook.
>
> *          *          *
>
> c. The benefits from the husband's benefits from the Plan in which Larry Edwin Cook is a Participant and the Plan or its administrator will pay benefits to the Alternate Payee, Linda Jean Rhyne Cook. . . .

[1]Although the parties referred to their agreement as a Property Settlement Agreement, the preferred term now is a "Marital Dissolution Agreement," or "MDA." Because this terminology is used regularly in our Opinions and those of our Supreme Court, we will refer to the Cooks' Property Settlement Agreement as an "MDA" in order to avoid confusion from using both terms to refer to the same document.

d. The alternate Payee, Linda Jean Rhyne Cook, shall receive her awarded share of the Plan, a one-third (1/3) interest in and to the Plan to which the Participant, Larry Edwin Cook, is entitled. The Alternate Payee, Linda Jean Rhyne Cook, shall receive her one-third (1/3) of the subject Plan by direct payment to Alternate Payee, Linda Jean Rhyne Cook, at her current address . . . or any subsequent address she might have. . . .

The parties signed a QDRO on October 22, 1993, ("the Initial QDRO") which contained language nearly identical to that in the MDA. The Trial Court approved this QDRO, but the Plan Administrator did not. Debbie Harbin, a benefits supervisor with the Plan, sent letters to Husband and Wife on June 7, 1995, identifying various problems with the Initial QDRO. The letters stated in pertinent part as follows:

The Plan Administrator has recently received the above-named domestic relations order for review. After carefully reviewing the order, it has been determined that the order is not a qualified domestic relations order ("QDRO") under federal law.

First, the method of determining the benefit awarded to the alternate payee is not clear. Although the order stated that the alternate payee is granted one-third interest in the participant's account, the date as of which that interest [sic] to be calculated is not clearly stated or otherwise determinable under the terms of the order, nor is it clear whether the award is for a fixed dollar amount.

Second, the name of the Plan is incorrectly stated. The Plan is known as the First Tennessee National Corporation Savings Plan.

Because the order is not a qualified domestic relations order, the Plan cannot pay any portion [sic] the Plan benefit as indicated in the order. If a new or revised order is obtained, the Plan Administrator will name a new determination as to the qualified status of the order.

On July 26, 1995, approximately one month and a half after Ms. Harbin sent the letter disapproving the Initial QDRO, the Trial Court approved an Amended Qualified Domestic Relations Order ("Amended QDRO") which attempted to correct the problems noted in Ms. Harbin's letter regarding the Initial QDRO. The Amended QDRO, which was signed by counsel for both parties, stated as follows:

This amended order is entered to correct the name of the Plan and to specify the date the Plaintiff's interest in the Plan is to be calculated.

1.  All references in the Qualified Domestic Relations Order entered in the cause styled Linda Jean Rhyne Cook vs. Larry Edwin Cook in the Jefferson County Chancery Court No. 93-212 to the Plan referred to as "The First Tennessee National Corporation Saving and Trust" shall hereinafter be referred to as "First Tennessee National Corporation Savings Plan."

2.  The Plaintiff in this cause, Linda Jean Rhyne Cook, is entitled to an [sic] one-third (1/3) share of the account balance of Larry Edwin Cook in the Plan up to and through October 22, 1993.

The Plan Administrator rejected this Amended QDRO as well. As a result, the Trial Court entered a Second Amended Qualified Domestic Relations Order ("Second Amended QDRO") on November 21, 1995. The Second Amended QDRO was signed by counsel for both parties and stated as follows:

This Second Amended Order is entered to fix the amount of the benefits of Linda Jean Rhyne Cook and to allowed [sic] her to withdraw such benefits. Heretofore, the parties have entered into a Qualified Domestic Relations Order to refer to the plan as "First Tennessee National Corporation Savings Plan".

\*          \*          \*

Therefore, this plan is further amended to fix the benefits of Linda Jean Rhyne Cook at the sum of Thirty Thousand, Thirty-Four Dollars and Sixty-Seven Cents ($30,034.67). Furthermore, Linda Jean Rhyne Cook is allowed to withdraw the benefits from said plan in the manner in which she so elects.

The Qualified Domestic Relations Order as Amended is otherwise reaffirmed.

The Plan Administrator refused to approve the Second Amended QDRO. For several years after that, apparently no additional action was taken on this case. Wife's one-third share of Husband's Plan remained with his portion of the Plan, and Husband continued to add money to his Plan through regular payroll deductions and matching employer contributions.

On November 9, 2004, the Trial Court entered another QDRO ("the 2004 QDRO"), which was drafted by Wife's attorney and signed by both parties. The 2004 QDRO contained the following provision:

-4-

As part of the just and right division of the estate of the parties, the Court awards, assigns and grants to Alternate Payee a separate interest in the Participant's total vested account balance under the Plan in the amount of thirty-three and one-third percent (33 1/3%) **as of October 22, 1993**, which sum shall be drawn from the funds maintained for Participant under the Plan. Such sum shall be adjusted for earnings or losses from October 22, 1993, to the date of distribution to the Alternate Payee. As soon as administratively practicable, such sum shall be credited to a separate account which shall be established and maintained in the name of Alternate Payee for Alternate Payee's benefit.

(Emphasis in original). It is unclear from the record whether this QDRO, although approved by the Trial Court and the parties, ever was sent to the Plan Administrator.[2] However, the parties agree that the Plan Administrator did not approve the 2004 QDRO or any of the previous QDROs.

On January 7, 2005, nearly a decade after the Plan Administrator rejected the Second Amended QDRO, Wife filed a petition asking the Trial Court to enter a Third Amended Qualified Domestic Relations Order granting Wife $165,014.22 of Husband's First Tennessee National Corporation ("FTNC") stock from the Plan. Husband answered, averring that Wife's portion of his Plan totaled $30,034.67 as recorded in the November 21, 1995, QDRO. Following a trial on this matter on November 28, 2006, the Trial Court awarded Wife $46,184.27 from Husband's Plan. Wife appeals.

## II. Discussion

Wife presents one issue for our review:

1. Whether the Trial Court erred in interpreting the parties' Property Settlement Agreement as granting Wife one-third of the value of Husband's savings plan at the time of the divorce, rather than one-third of the actual shares of First Tennessee National Corporation stock in the Plan.

Our Supreme Court has stated that "[a]n MDA is a contract and as such generally is subject to the rules governing construction of contracts." *Johnson v. Johnson*, 37 S.W.3d 892, 896 (Tenn. 2001) (citing *Towner v. Towner*, 858 S.W.2d 888, 890 (Tenn. 1993); *Gray v. Estate of Gray*, 993 S.W.2d 59, 63 (Tenn. Ct. App. 1998)). The interpretation of a contract is a question of law. *Buettner v. Buettner*, 183 S.W.3d 354, 358 (Tenn. Ct. App. 2005) (citing *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)). Therefore, we review a trial court's interpretation of a marital dissolution agreement *de novo* with no presumption of correctness. *Bridges v. Bridges,* 168 S.W.3d 158, 160 (Tenn. Ct. App. 2004).

---

[2]The record does not contain a letter from any Plan employee describing the problems with this QDRO.

In *Elliot v. Elliot*, we discussed the nature of marital dissolution agreements and the rules governing their construction, as follows:

> An MDA's provisions pertaining to the division of the parties' marital estate are essentially contractual, even after they have been judicially approved and incorporated into a divorce decree. *Johnson v. Johnson*, 37 S.W.3d at 896; *Wade v. Wade*, 115 S.W.3d 917, 924 (Tenn. Ct. App. 2002); *Gray v. Estate of Gray*, 993 S.W.2d 59, 63 (Tenn. Ct. App. 1998). The parties may not unilaterally modify an MDA once it has been approved by the trial court. *Johnson v. Johnson,* 37 S.W.3d at 895. In fact, both parties obtain a vested interest in the property allocated to them in the MDA, and neither party may frustrate the other's receipt of his or her vested interest. *Johnson v. Johnson*, 37 S.W.3d at 897.

> The portions of an MDA that remain contractual after the trial court has approved them should be construed and enforced like other contracts. *Bogan v. Bogan*, 60 S.W.3d 721, 730 (Tenn. 2001); *Gray v. Estate of Gray*, 993 S.W.2d at 63. Thus, our goal is to ascertain and give effect to the parties' intentions. *Ahern v. Ahern*, 15 S.W.3d 73, 81 (Tenn. 2000). Our search for the parties' intentions must focus on the MDA itself. Each provision of an MDA should be construed in light of the entire MDA, and the language in these provisions should be given its natural and ordinary meaning. We should construe MDAs fairly and reasonably, and we should avoid rewriting these agreements under the guise of "construing" them. *Duvier v. Duvier*, No. 01A01-9311-CH-00506, 1995 WL 422465, at *3 (Tenn. Ct. App. July 19, 1995) (No Tenn. R. App. P. 11 application filed).

*Elliott v. Elliott*, 149 S.W.3d 77, 84 (Tenn. Ct. App. 2004).

During the parties' marriage, Husband's Plan allowed him to invest his contributions in any combination of four funds: Fund A (common stock); Fund B (fixed income); Fund C (First Tennessee National Corporation stock); and Fund D (money market). Husband's October 1, 1993, statement – the last statement he received before the parties' divorce – showed that the total value of Husband's Plan was $82,765.45. Of that amount, more than 97 percent was invested in Fund C. Husband's statement indicated that "[t]he value of your Fund C accounts represents approximately 1,982 shares of FTNC stock valued at [$]40.000 as of 10/11/93." In her petition, Wife alleges that she was entitled to one-third of the actual FTNC stock in the Plan at the time of the divorce, or 660.66 shares. Because FTNC has had two stock splits since the date of the parties' divorce, Wife maintains that her current interest is 3,837.54 shares. With an approximate current value of $43 per share, Wife states that her "value in the First Tennessee stock account" is $165,014.22. Accordingly,

Wife requested that the Trial Court enter a QDRO designating Wife's portion of Husband's plan to be $165,014.22.

At trial, Walter Lane Cooper, II, president of Financial Service Associates, testified as an expert witness regarding the value of Wife's portion of the Plan. Financial Service Associates provides third-party administrative services for qualified retirement plans sponsored by employers, and one of the company's functions is handling distributions for retirement plans, such as the one in which Husband is enrolled. Mr. Cooper initially testified that the QDRO awarded Wife one-third of the Fund C account, which is FTNC stock. He stated that Wife's one-third of the Plan's 1,982 shares "became a traceable, recognizable investment" so that the yield from those shares could be calculated. Using records from October 1993 through September 30, 2004, regarding dividends paid to FTNC shareholders and stock splits that occurred, Mr. Cooper calculated that Wife's 660.6 shares have grown to 3,837.54 shares with a current value of $171,461.00.

Mr. Cooper testified that as of December 31, 2004, Husband's Plan contained 3,865.792 shares of FTNC stock.[3] Mr. Cooper also stated that Husband had transferred money between the various funds in the Plan throughout the years since his divorce, thus reducing the percentage of his account that is composed of FTNC stock.

On cross-examination, Mr. Cooper clarified that Wife had not actually been awarded one-third of the FTNC stock, but rather one-third of the entire account, of which the majority was FTNC stock. Furthermore, Mr. Cooper admitted that the Plan Administrator would divide the Plan according to a certain amount of money, not by the number of stock shares, stating as follows during cross-examination:

> Q. Of course you do this every day. If you sent a letter out and you were Administrator, like First Tennessee did to these two folks, what would you be wanting them to accomplish when you sent the letter that's there as Exhibit #9?
>
> A. I would want them to present me with an Order that I could accept as qualified, which means working on behalf of the employer I can identify the payee and alternate payee, the addresses, the disclaimers and the specific dollar amount or the percentage amount on a date that the Plan values the assets.
>
> Q. And of course clearly the last Order entered back in '95, sets out a dollar amount, the $30,000.00?

---

[3] Mr. Cooper testified that First Tennessee National Corporation underwent a name change following the parties' divorce and is now known as "First Horizon National Corporation." For the sake of simplicity, we will continue to refer to the company using its original name.

A.  It does.

Q.  And they all require that, don't they?

A.  They either require a dollar amount or a percentage amount.

Q.  Percentage, but you've got to know to take that percentage and calculate it in terms of money?

A.  Right.

Q.  Right.  Not stock, money?

A.  Money.

At the request of Husband's counsel, the Trial Court admitted the deposition testimony of Holly Nance, an employee of the 401K Company, the entity that administers the 401(k) plan for First Tennessee Bank.  Ms. Nance testified that the 401K Company has administered the Plan since August 1, 2003, and that her company also has records dating back to 1999 for Husband's Plan, as well as the QDRO entered by the Trial Court on October 22, 1993.  Based on that QDRO, Ms. Nance stated that Wife's portion of the Plan was $27,588.48, which was one-third of the total value of Husband's Plan in October of 1993.  Because the 401K Company did not have access to Plan records earlier than 1999, Ms. Nance also calculated possible rates of return for Wife's portion through July 1, 1999, based on interest rates of four, five and six percent.  From July 1, 1999, through November 24, 2006, Ms. Nance used the actual internal rate of return for Husband's Plan. Using those calculations, Ms. Nance testified that Wife's portion of the Plan would be worth the following amounts using the various interest rates mentioned above: $42,277.20 using a four-percent interest rate until July 1, 1999, and then the internal rate of return through November 24, 2006; $44,230.73 with a five-percent interest rate until July 1, 1999, and the internal rate of return afterward; and $46,184.27 with a six-percent interest rate until July 1, 1999, and the internal rate of return through November 24, 2006.

Husband testified that Wife was entitled to a little more than $27,000, which was one-third of the value of his Plan as of October 1993 when the parties divorced.  He denied that she had been awarded shares of FTNC stock rather than a specific dollar amount.  Husband also explained the reasoning behind the award of $30,034.67 to Wife in the Second Amended QDRO, as follows:

I don't remember if they calculated it with the Plan Administration or Administrator or [Wife] and I determined it based on an interest rate. You know, she says I'm entitled to interest, I said, I agree with you, and that's why it went up.

But I don't remember if we calculated it, seems like we did. But I can't determine, I mean I can't tell you a hundred percent if we did or if the Plan Administrator did.

Husband denied that Wife had ever mentioned having shares of stock from his Plan. He stated that he had contributed approximately $120,000 to the Plan since his divorce. Husband admitted that he had transferred money within his Plan from one fund to another, which had resulted in some investment losses. Husband's Plan is now worth approximately $267,000.

Wife testified that the attorney who signed the Amended QDRO in 1995 on her behalf did not have her consent to do so. She also stated that she left investment decisions regarding the Plan to Husband, even after they were divorced. She testified that she did not think Husband would cheat her out of any money regarding the Plan, and that she would not cheat him either.

After hearing all of the testimony, the Trial Court stated as follows:

But there's really nothing that says that [Wife] got one/third of the stock, even though that was almost all of what was in existence at that time.

Quite frankly it's now, that's certainly the most beneficial way for [Wife] to approach this claim, because it renders to you the largest sum of money.

\*               \*               \*

I think that the Court is going to find that neither party has done what they really should have done in attending to the business at hand following the entry of this divorce decree, which then means that what's good for the goose is good for the gander or vice versa. If there's been a loss he has suffered, she has suffered.

I can't segregate her value back in '93 as specifically being stock.

And the best choice among all those things that I've mentioned is for me to find that her value as of October the 22nd, 1993, was $27,588.48, and calculate a rate of return on that at the six percent level, which would get her to $46,184.27.

We find no error in the Trial Court's ruling. We have discovered no way to make all of the domestic relations orders consistent with each other and with the MDA incorporated into the Judgment. The MDA refers to Wife receiving a "sum" by "direct payment," which would seem to indicate a cash payment of a specific dollar amount. But the 2004 QDRO states that Wife's portion

"shall be adjusted for earnings or losses," which suggests that Wife was supposed to receive stock instead. After all, a cash payment cannot have losses, but stock prices vary daily.

We bear in mind that all of the domestic relations orders approved by the Trial Court were attempts to facilitate the transfer of Wife's portion of the Plan into her custody according to the terms of the MDA, which was incorporated into the Judgment granting Wife a divorce. We have repeatedly held that a QDRO that is inconsistent with the terms of the divorce decree cannot be enforced.

In *Maxwell v. Maxwell*, No. 01A01-9402-CV-00086, 1994 WL 527134 (Tenn. Ct. App. M.S., Sept. 28, 1994), we vacated a QDRO that was inconsistent with the parties' divorce decree because it increased the wife's share of the husband's retirement benefits. In doing so, we stated that "the QDRO amended, in an impermissible manner, the final judgment, and to the extent it deviated from the judgment, it is void." *Id.* at *1. We concluded as follows:

> The judgment of December 7, 1984, which approved and incorporated the Property Settlement Agreement, became final 30 days after entry, and beyond the reach of the Court. Paragraph eight thereof, which we have reproduced, provides in plain English that Mrs. Maxwell, *as of the date of granting the divorce*, has a vested interest in one-third of the retirement-pension of Mr. Maxwell.
>
> This clear expression is not ambiguous, and any effort, six years later, to reinterpret it to the advantage of Mrs. Maxwell must be unavailing.
>
> The QDRO, as amended, is vacated as being beyond the authority of the Court to grant, since it purports to amend a judgment that had become final more than seven years previously.

*Id.* at *1-2 (emphasis in original).

In *Lagrone v. Lagrone*, No. 01A01-9603-CH-00125, 1996 WL 512032 (Tenn. Ct. App., Sept. 11, 1996), we vacated a QDRO entered by the trial court that conflicted with the terms of an MDA incorporated into the divorce decree, stating as follows:

> The QDRO in the case before us does not conform to the provisions of the Final Decree of divorce which had become final long before the QDRO was entered. The provisions of this QDRO would, in effect, modify a property division which is not modifiable once the divorce decree becomes final.

*Lagrone*, 1996 WL 512032, at *3.

Therefore, the Trial Court's order regarding the Third Amended QDRO requested by Wife must be consistent with the terms of the divorce decree and, consequently, the MDA. After careful review, we hold that the Trial Court's order regarding the division of Husband's Plan comports with the language of the MDA. The MDA, at various points, provides that Wife will receive one-third of the Plan, a one-third interest in the Plan, and a one-third share of the Plan. The MDA does not, at any point, state that Wife is to receive only one-third of the actual FTNC stock or the Fund C assets rather than one-third of the entire value of the Plan. Furthermore, the MDA indicates that Wife "shall receive her one-third (1/3) of the subject Plan by direct payment" to her current address, which is consistent with a cash payment rather than the receipt of stock.

We disagree with Wife's contention that the November 8, 2004, QDRO supercedes the prior QDRO because it was the last document signed by both Husband and Wife. As we mentioned earlier, the Trial Court's Judgment incorporating the parties' MDA is the controlling document that sets forth the division of property. The terms of the Judgment, including the property division, cannot be altered by a subsequent document, even if such a document is signed by both parties.

We find no error with the Trial Court's interpretation of the Judgment and MDA as granting Wife one-third of the total value of Husband's Plan as of the date of their divorce. Given the lack of information available as to the actual rate of return for the entire period between the divorce and the hearing on Wife's petition, we also find no error with the Trial Court's decision to award Wife interest, as calculated, on her portion of the Plan.

### III. Conclusion

We affirm the Trial Court's order setting Wife's portion of the Plan at $46,184.27 and requiring the parties to submit a QDRO reflecting same. We remand to the Trial Court for collection of costs. Costs on appeal are taxed against the Appellant, Linda Jean Cook (Ramsey), and her surety, if any.

_____
D. MICHAEL SWINEY, JUDGE

-11-