# IN THE COURT OF APPEALS OF TENNESSEE
# AT NASHVILLE
November 3, 2009 Session

## CYDNIE B. O'ROURKE v. JAMES P. O'ROURKE

**Appeal from the Chancery Court for Williamson County**
**No. 27493     Robert E. Lee Davies, Judge**

---

**No. M2007-01833-COA-R3-CV - Filed November 10, 2010**

---

In the last proceeding in this protracted post-divorce litigation, the trial court transferred custody, or primary residential placement, of three children of a divorced couple from the mother to the father. In this consolidated appeal, the mother claims that the trial court erred in a number of ways. However, a number of her arguments relate to orders or actions that have been rendered moot by the final order, including her challenges to the use of a "parenting coordinator." As to the final order modifying residential placement, we hold that the trial court did not err in declining to use Tenn. Code Ann. § 36-6-406 to limit the father's visitation with the children and that the court acted within its discretion in limiting the testimony of Mother's expert witness as a discovery sanction. We also hold that the trial court's award of $330,000 in attorney fees to the father was not error. We affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR. and ANDY D. BENNETT, JJ., joined.

Cynthia A. Cheatham, Manchester, Tennessee, for the appellant, Cydnie Browning O'Rourke.

Helen Sfikas Rogers, Lawrence J. Kamm, Nashville, Tennessee, for the appellee, James Patrick O'Rourke.

A. Gregory Ramos, Nashville, Tennessee; Thomas C. Means, Michelle A. Jones, Phillip D. Mancini, Washington, D.C., for Amici Curiae, Domestic Violence Legal Empowerment and Appeals Project, et al.

# OPINION

## I. DIVORCE PROCEEDINGS

James Patrick O'Rourke ("Father") and Cydnie Browning O'Rourke ("Mother") became the parents of nine children during their marriage of 28 years. In February of 2000, Mother filed a Complaint for Legal Separation from Father, which she later amended by making it a Complaint for Absolute Divorce. She also asked for and obtained an ex parte Order of Protection and a Restraining Order, prohibiting Father from engaging in physical violence against her or interfering with her possession of the minor children. With the help of mediation, the parties subsequently executed a Marital Dissolution Agreement (MDA) and a Parenting Plan, which were incorporated into a Final Decree of Divorce, entered on April 17, 2001. Five of the children were still minors at the time of the divorce.

The Decree granted Mother an absolute divorce. No alimony was awarded, but the division of marital property included a cash settlement of over $3 million to be paid to Mother.[1] The MDA and Parenting Plan designated Father as the custodial parent of Michael, the oldest minor child, and Mother as the custodial parent for the four younger children, Daniel, Katherine (Katie), Caroline and Samuel (Sammy). Father was ordered to pay child support in the amount of $6,000 per month.

Each custodial parent was authorized to make all major decisions regarding the health, education and welfare of the child or children in that parent's custody, except for some special provisions regarding the education of the four youngest children. Mother was permitted to continue home-schooling the children in her custody, but a teacher-consultant, selected by Mother and approved by a clinical psychologist, Dr. Joe LaBarbera, was to be hired to help the children improve their academic performance. An individualized education plan was to be devised for each child, with annual standardized testing to be performed to assess their progress.

The plan also included standard parenting rights as set out in Tenn. Code Ann. § 36-6-101(a). These included the right of each parent to be free of derogatory remarks uttered by the other parent to the child or in the child's presence; each parent's right to unimpeded phone conversations with the child at least twice each week at reasonable times and for a reasonable duration; and in the event that a parent leaves the state with the child for more than two days, the right of the other parent to receive an itinerary, including telephone numbers for use in the event of an emergency.

---

[1]The division of marital property is not at issue.

Despite the apparently comprehensive nature of the parenting plan, the parties frequently found themselves at odds over its implementation, and they returned to court on a frequent basis.

In February of 2002, Father filed a "Petition for Contempt and Educational Decision-Making." The hearing on the petition included the testimony of Dr. LaBarbera about the testing of the children, the viability of the home schooling, and the learning problems the children were experiencing. The court determined that the parenting plan had to be modified, and it ordered that Daniel and Katie be placed in traditional schools of Mother's choice.[2] Home-schooling for Caroline and Sammy was to be continued, subject to Mother's use of a teacher-consultant and the registration of her home school with the Williamson County Board of Education. *See* Tenn. Code Ann. § 49-6-3050.

The appeal before us involves later decisions in the protracted case. We need not recite in detail the numerous motions and responses filed in this case, but we note that between the date of the divorce and the date of the order which is the subject of this appeal, Mother hired and discharged eleven different attorneys of record; that we have already filed two appellate opinions resulting from her appeals to this court;[3] that four separate appeals have been consolidated in the present case; and that the record before us is voluminous.

## II. APPOINTMENT OF A PARENT COORDINATOR

In 2004, Father filed a Petition for Change of Custody.[4] In an order filed October 19, 2004, the trial court denied Father's request to be named as the primary residential parent. The court included in its order the appointment of a Parent Coordinator "under the authority and jurisdiction of the Guardian Ad Litem statutes." The court required that any disputes between the parties on any issue concerning the minor children first be brought to the Parent Coordinator. By this time, only Katie, Caroline and Sammy were still minors.

---

[2]One of the court's reasons for placing Daniel in traditional school was because he was 14 years old and reading at a third grade level. At the final custody hearing in this case in 2007, Father testified that Daniel had just finished his first year of college.

[3]The two opinions referred to are *O'Rourke v. O'Rourke*, No. M2007-02485-COA-R3-CV, 2009 WL 1579244 (Tenn. Ct. App. June 5, 2009) (Motion to Rehear denied July 7, 2009) (Rule 11 permission to appeal denied Jan. 25, 2010) and *O'Rourke v. O'Rourke,* No. M2006-01071-COA-R3-CV, 2007 WL 1815413 (Tenn. Ct. App. June 15, 2007) (no Tenn. R. App. P. 11 application filed).

[4]Father's 2004 Petition for Change of Custody is not included in the appellate record.

The court's order gave the Parent Coordinator the authority to convene a meeting of the parents, to investigate any issue, and to help the parents reach an agreement. If the parents could not agree, the Parent Coordinator had the sole authority to determine what should be done as to the issue under review, provided that if either party was dissatisfied with the Parent Coordinator's decision, he or she was entitled to ask the court to review the decision "under the same standards as would be applicable in other cases." Among other things, the Parent Coordinator was given the authority "with the agreement of at least one parent" to make changes in the timing and conditions of visitation, and "changing education, day care, and/or extracurricular activities for the children." Mother did not appeal the court's decision to appoint a Parent Coordinator.

The parties mutually agreed to the appointment of Murphy Thomas, Ph.D., a licensed Clinical and Consulting Psychologist, as the Parent Coordinator. Dr. Thomas subsequently moved the trial court to further clarify his duties and his authority. The court responded with an order dated November 2, 2005 that did so, "pursuant to the stipulation of the parties." Among other things, the order declared that Dr. Thomas would not provide health-related services such as diagnosis or treatment to any party to the agreement, and that "[t]he Parent Coordinator may **not** make a decision to change the legal custody of the child(ren)." (*emphasis in original*).

Dr. Thomas was unable to resolve the differences between Father and Mother. He was also unable to prevent the emergence of a serious conflict between Mother and Katie, which led Mother to call the police to her home on at least two occasions because of Katie's unruly behavior. Dr. Thomas subsequently directed Mother not to call the police on her daughter again without first trying to work out their issues with his help. Upon her sixteenth birthday, May 1, 2006, Katie left Mother's home, and moved in with Father.[5]

On May 30, 2006, the trial court conducted a hearing on a number of motions filed by the parties, including Father's motion to modify child support, which the court granted in part and denied in part. Father had asked the court to reduce child support because Daniel had reached the age of eighteen and graduated from high school, and Katie was now living with Father instead of with Mother. The court reduced Father's child support obligation to $4,100 per month because of Daniel's majority.

The court also declared that it was reserving the question of adjusting support for

---

[5]Katie was able to decide to move to Father's house because of a provision in the amended parenting plan, which was entered on August 20, 2002. That provision reads, "[a]dditional time to be spent between children 16 and over and the Father shall be scheduled directly between the child and the Father provided that such visitation does not interfere with school or other scheduled activities."

Katie until after Father filed a petition for custody, but that any subsequent reduction in child support based on Katie's change of residence would be retroactive to May 2, 2006.[6] On July 11, 2006, Father filed a petition asking the court to transfer legal custody of Katie to him and to modify his child support. Father attached to his petition a letter from Dr. Thomas in support of the change of custody.

At around the same time, Father sent a lengthy e-mail to Dr. Thomas, stating that he was very concerned about the emotional well-being and development of Caroline and Sammy, who remained in Mother's custody. His message detailed an uncooperative course of conduct by Mother that he alleged was designed to thwart the children's relationship with him.

Among other things, Father alleged that Mother prevented the children from engaging in any extracurricular activity where Father might have a role; that in violation of the parenting plan she refused to take telephone calls from Father; that she instructed the children not to talk to him on the phone; that she hid the telephones in her 9,000 square foot house; that she made the children pray for their safety and safe return immediately prior to every visit to Father; and that she used home schooling to indoctrinate the children to dislike Father and anything associated with him. Father accordingly asked Dr. Thomas to modify the amended parenting plan to place the two children in a traditional school by the beginning of the Fall 2006 school term, to increase his time with them, and to modify the conditions for their transportation and exchange.

On July 17, 2006, Dr. Thomas sent identical letters to Mother and Father in his capacity as Parent Coordinator, discussing the issues Father had raised about Mother's behavior and about the education of Caroline and Sammy. In his letter, Dr. Thomas stated that he had asked Mother for her response to Father's request and to his allegations, but that she had failed to provide him with a meaningful response or to provide any relevant information. He also stated that he had met with the two children and had consulted with Dr. LaBarbera, who had been counseling the children since the divorce.

Dr. Thomas declared that he found that Mother was attempting to alienate the younger children from Father, but that "this does not appear to be the case with the father, who encourages the children who reside in his home to communicate and visit with their mother." Dr. Thomas concluded that it was in the best interest of the minor children that they begin attending a traditional school in the fall and that they enroll at the beginning of the term so

---

[6]Mother filed an appeal of this order, which was given Court of Appeals Number M2006-01577-COA-R3-CV.

as to make their adjustment to the new situation easier than it would be if they were to transfer into the school after the term had begun.

The final section of the Parent Coordinator's letter was worded in the form of an order that Caroline and Sammy begin attending a traditional school of Mother's choice in Fall 2006; that Father and Mother both undergo a psychological evaluation; and that Father's residential schedule be modified to give him slightly more time with the children, and to provide for the transfer of the children in a way that would reduce the possibility of conflict between the parents.

Shortly thereafter, Mother responded with an "Emergency Motion to Object to Parent Coordinator Order and to Stay Changes in Parenting Plan." The Court declined to set a hearing on Mother's emergency motion, and the next day, she filed a Rule 60 Motion to set aside the "order" of the Parent Coordinator. In her very lengthy motion (167 pages including attachments) Mother argued among other things that the appointment of the Parent Coordinator and the delegation of certain powers to him infringed on her constitutional right to parent her own children. Father then filed his own motion to enforce the Parent Coordinator's "order." The record shows that after the filing of her motion, Mother's attorney advised Mother not to have any further communications with Dr. Thomas.

The trial court heard Mother's Rule 60 motion and Father's opposing motion in proceedings that started on August 8, 2006. Dr. Thomas took the stand over the objections of Mother's attorney, who argued that if he was deemed to be acting under the Guardian ad Litem statutes, then he was barred from testifying. Dr. Thomas was questioned at length by the court and by the attorneys for both parties, and he testified about his dealings with Father and Mother and his observations of the children.

The Parent Coordinator testified that he initially found Father very difficult to deal with because of his domineering personality, but that Father eventually realized that such an approach was counterproductive, and he became more flexible and more willing to acknowledge his mistakes and to learn from them. Dr. Thomas also testified that Father did not try to prevent the children from maintaining a positive relationship with Mother, but rather encouraged such a relationship.

In contrast, Dr. Thomas found Mother to be very much entrenched in the belief that she was a victim, remaining bitter and resentful against Father, and totally unwilling to cooperate with him. The Parent Coordinator testified that Caroline and Sammy were very protective of Mother and dismissive of Father, which he attributed to Mother's efforts to keep them isolated and in a bubble where they couldn't be exposed to or influenced by anything she disagreed with. He concluded that Mother's controlling ways and a home

schooling regimen that left Caroline and Sammy with her almost 24 hours a day caused serious problems with the children's social and emotional development.

At the conclusion of the hearing, the trial court transferred temporary custody of Caroline and Sammy to Father for the purpose of enrolling them in a traditional school. The court also ordered that Mother and Father both undergo psychological evaluations performed by Dr. William Bernet and Dr. James Walker at the Vanderbilt University Medical School Department of Psychiatry.[7] The proof shows that after this order was filed, both children enrolled at Brentwood Middle School, where they did very well academically and socially.

### III. A CHANGE IN RESIDENTIAL PLACEMENT

#### A. The Modification Petition

As we noted above, Father filed a petition on July 11, 2006, asking the court to transfer legal custody of Katie to him. On August 4, 2006, he filed an amended petition for change of custody, in which he asked for custody of all three of the parties' minor children. He alleged that Mother's bizarre conduct after Katie left Mother's home amounted to a material change of circumstance justifying such a change of custody.

As in his earlier e-mail, Father cited Mother's efforts to alienate the two younger children from him. Among other things, he claimed that in the face of contrary provisions in the parenting plan, Mother had consistently refused to allow telephone calls between Father and the children; that she did not communicate with Father about the children's educational progress; that she had avoided making them available for academic and psychological testing; that she made transfers to Father for visitation as difficult and as uncomfortable as possible, with the aim of thwarting such visitation; and that she had encouraged Caroline and Sammy to ridicule Katie and to claim that she was no longer part of the family because she was living with Father.

Prior to the hearing on Father's custody petition, each of the parties filed petitions for contempt against the other, and both filed proposed parenting plans. Father proposed that he be named as the primary residential parent and that Mother be awarded 100 days of visitation with the children each year. Mother proposed that she remain the primary residential parent and that Father be awarded two hours of supervised residential time with the children every two weeks.

---

[7]Mother appealed to this court from the order resulting from the hearing of August 8, 2006. That appeal was given Court of Appeals number M2006-1917-COA-R3-CV.

**B. Psychological Testimony**

The hearing on Father's custody modification petition was conducted over four days, on May 14, 15, 16, and 18, 2007. One full day of testimony was given over to the testimony of Dr. William Bernet, the psychiatrist, who together with Dr. James Walker, had performed psychological evaluations of both parents. Their evaluations were placed into evidence. Dr. Walker was out of state at the time of trial, and his videotaped evidentiary deposition was also admitted into evidence. Dr. LaBarbera, who treated the three youngest children, testified through a videotaped evidentiary deposition as well. Mother's expert witness, Dr. Robert Geffner, a clinical psychologist from San Diego, California, testified in person. His testimony was subject to an order limiting it to the substance of two affidavits he had submitted to the court, because of Mother's failure to timely comply with Father's requests for discovery as to the identity and opinions of her expert.

Dr. Bernet's assessments were based on a series of psychological tests he had administered to both parties, as well on his observations of them during interviews. He testified that he found both parties to have their strengths and weaknesses, and that both were dedicated parents. Dr. Bernet found Father's psychological functioning to be generally good, without any specific or serious psychiatric symptoms or mental illness. He stated that Father did have a problem with anger, but that he was learning to control it, and that he had also learned to become much more patient, more aware of his own faults, and more willing to admit when he was wrong.

Father admitted abusing Mother prior to the divorce, but the degree and frequency of the abuse was in dispute. Mother's attorney closely questioned Dr. Bernet on cross-examination about his evaluation of Father, including a great number of questions about Father's conduct prior to the divorce. An example was, "[d]o you think that physically abusing the mother of your children, sometimes in front of the children, is a weakness regarding parenting skills?" Father's attorney objected on the basis of relevance and because there was no proof that Father had ever struck Mother in the presence of the children.

As to Mother, Dr. Bernet testified that she had "maladaptive personality traits" that caused her moderate difficulty in functioning, including difficulty getting along with other people and dealing with family members. Dr. Bernet found her to be extremely insecure and fearful, which made her overly dependent on her children for emotional support and overly aggressive and angry when fighting over the children with Father. Dr. Bernet also testified that Mother told him that Father has abused the children since the divorce, but when she was asked for details she was unable to furnish any.

There was evidence that Mother had suffered a stroke during childbirth in the 1980's, and Dr. Bernet testified that an event like that sometimes affects the patient's thinking. Dr. Bernet noted that when people disagree with Mother, her reaction is to cut off all contact with them. He also found that her anger at her former husband leads Mother to do things with the children "that are not healthy." For example, when he was questioned about Mother's practice of leading the children in a prayer for their safe return prior to every transfer to Father for visitation, Dr. Bernet acknowledged the value of religious belief and practice, but he testified that this practice had the effect of transferring Mother's fearfulness to the children.

Dr. Geffner's two affidavits to the court were executed on February 13 and February 27, 2007. Prior to executing the affidavits, he had spoken to Mother on the phone as well as to the parties' adult daughter Shawn Sanders, but he did not speak to Father or to any of the other witnesses in this case.[8] He also examined the materials that Mother or her attorney had sent him. His affidavit stated that "[b]ased upon the records, interview, and tapes, it appears that Mr. O'Rourke exemplifies an abuser who has emotionally and physically abused his former wife and his children." He also stated that "[h]e continues to manipulate and emotionally to abuse her in this battle to get custody and control of her."

In his affidavits, as well as during nearly a full day of trial testimony, Dr. Geffner challenged the use of the MMPI and other psychological tests by Drs. Bernet and Walker. He stated that questions of domestic abuse and family violence implicated a specialized area of psychological practice which required a totally different testing regimen. He testified that he himself was an expert in the area of family violence and abuse, as shown by numerous publications he had authored and by his participation in professional societies that focus on those areas. These included the Natural Resource Center on Family Violence and Sexual Assault, an organization he had founded and in which served as president.

Dr. Geffner testified that none of the other psychiatrists or psychologists involved in this case possessed credentials similar to his, and he declared that the lack of such credentials rendered any opinions they might have as to the relative fitness of Father and Mother for parenting responsibilities suspect at best.[9] He also stated that when a mental health professional conducts an evaluation outside that professional's expertise, it raises serious

_____

[8]The record shows that Mother took the children to San Diego to be examined by Dr. Geffner after the court limited his testimony to the matters set out in his two affidavits.

[9]Although Dr. Bernet had not made domestic abuse his specialty, his CV shows that he authored or co-authored a number of articles in professional journals about the evaluation of child abuse and about the therapist's role in child custody disputes.

ethical issues. He accordingly recommended that Mother file ethics complaints with Vanderbilt and the State Licensing Boards against the other mental health professionals involved in the case.

Dr. Geffner testified on cross-examination that he no longer treats patients, but devotes all his time to consulting work related to his specialty. Father's attorney questioned Dr. Geffner about his participation as an expert witness in a number of cases in different jurisdictions. These included *Clark v. Collins*, 956 F.2d 68 (5th Circuit 1992), a criminal case from Texas in which the court found that Dr. Geffner's affidavit lacked credibility, in part because it was based on hearsay information supplied by the defendant's attorney, with no independent verification of the information.

The court likewise excluded Dr. Geffner's testimony in *Hawaii v. French*, 129 P.3d 581 (Hawaii 2006), which involved allegations of child sexual abuse. In *State v. Supulvado*, 655 So.2d 623 (La. App. 1995), the court limited Dr. Geffner's testimony because he mostly relied upon information supplied by the defendant and because although he is not a medical doctor, he tried to testify about the effects of brain damage on emotional functioning. Dr. Geffner acknowledged that he has testified in a great number of cases, but stated that he did not remember very much about the facts of those particular cases.

## C. Testimony by Family Members

Mother took the stand on the second day of trial. Father's attorney asked at the outset if her preference was for Father to have no contact at all with the children or supervised contact at most. Although she responded in the negative, her full answer reveals that she does not believe that Father has changed in any significant way since the divorce.

Mother testified that she does not answer phone calls from Father unless she knows there is an existing emergency situation, but she denied that she interfered with Father's phone calls with the children. She further stated that she does not want to have any contact with Father, and does not want to have anything to do with Father's present wife, Tammy O'Rourke. Mother was questioned about incidents where she did not give Father her itinerary when she left the state with the children, and she testified that she does it because she does not want him to interfere with the trip or to try to stop her. Under questioning, she was unable to give any examples of such conduct on his part.

Mother also claimed that Father manipulated Katie for two years prior to her leaving for Father's home, that he was attempting to manipulate all of the children, and that he was a bad influence on them. She admitted under questioning that she had reported to the Florida Department of Children's Services that Father had abused all her children as well all of

Tammy O'Rourke's children from an earlier marriage.[10]  The Department of Children's Services determined that those reports were unfounded.

Mother was questioned about her relationship with her second oldest child, her daughter Shawn Sanders, who lives in Colorado.  Phone logs that were entered into evidence showed that between the end of 2003 and February 2007, an average of 20 to 30 phone calls were made each day from Mother's phone to Ms. Sanders, which typically amounted to a total of 200 to 300 minutes daily.  Mother denied that she talked to her daughter that much, and she testified that Caroline and Sammy were responsible for some of the calls.

Ms. Sanders' testimony at a later point in the hearing showed that she consistently reinforced Mother's grievances against Father and that she and Mother were in total agreement that Father should not have access to the minor children.  The proof showed that Mother turned to Shawn for advice on matters large and small, including all those involving the children and the courts.  In contrast with her warm relationship with Ms. Sanders, Mother has a much less friendly relationship her other adult children.[11]  Mother also testified that she does not talk to any of her own siblings.

When he was called to the stand, Father stated that the primary reason that he should have custody of Katie, Caroline and Sammy was that he believed this was the only way for the children to have any potential for a relationship with both their parents.  He declared that he wanted the children to maintain a good relationship with Mother, and that he was always flexible in matters involving scheduling and visitation for her benefit and for theirs.  He specifically stated that when Katie was with him, he frequently encouraged her to call Mother, but that Mother refused to take her phone calls.  He further testified that the children enjoyed being at his house.  He acknowledged that when Caroline visited, she always seemed determined at first not to be happy, but that after a while she would "thaw out," and start having a good time with her siblings and her stepsisters.

Near the conclusion of his testimony, the trial court asked Father, "what have you learned about yourself since this divorce and how have you dealt with it?"  Father responded at length about what an intense learning experience the last six years had been for him.  Among other things, he said that he has finally realized that for good or for ill, what he says

---

[10]Father has met Tammy O'Rourke in Jacksonville, Florida, where she lived prior to her marriage to Father.

[11]In response to a friendly e-mail from Father telling Mother that Michael and Daniel were coming to town for a visit, Mother responded with an e-mail to her attorney (which she also forwarded to Father, thereby waiving the attorney-client privilege).  Mother's e-mail stated that "[a]n army of my adult children is coming to town to fight against me and against Shawn, and we do not have a chance against them."

and does has a tremendous effect on his children and on other people, and that when he is angry he does not make good decisions. He acknowledged that he has made a lot of mistakes, and he credited Tammy O'Rourke for teaching him a lot about himself, and for pointing out his mistakes when necessary. He acknowledged that he was not fair to Mother during their marriage, because he mistakenly failed to love her as he should have and to respect her dignity as a person.

Fourteen year-old Caroline and twelve year-old Samuel both testified.[12] Caroline stated that she doesn't like school, but that she is doing well, with grades of A and B in most of her courses. She also plays basketball at her school, and she has made friends there, but she is still close with her home-school friends. Caroline sees Dr. LaBarbera for counseling twice a month, but she testified that she hates having to go there. She also testified that she calls her sister Shawn two or three times every day.

Caroline's testimony about Father was largely negative, and she made it abundantly clear that if she had her choice she would rather live with Mother. She initially denied that there was anything she enjoyed about staying at Father's house, but under questioning (and after she was shown some photos of herself having fun with her siblings and step-sisters) she grudgingly admitted that she liked some of her step-sisters (Tammy O'Rourke's daughters), that she sometimes has fun at Father's house, and that she has enjoyed some activities with Father's blended family, like a trip to the Six Flags amusement park and gatherings at Father's farm in Lawrenceburg.

Caroline also stated that she doesn't love her father because "I don't think he likes me." She was asked if he has told her that he loves her, and she answered that he did. Asked why she didn't believe him, her answer was, "Because I don't believe him, just don't."

Mother's attorney asked Caroline what she fears the most.

A. Living with my dad.
Q. Living with your dad. Why is that?
A. Because I don't want to live with a man who has been, like, abusive in the past.

Like his sister, Sammy was also doing well in school, and none of his grades was lower than a B. He stated, however, that if he had his choice, he would rather be home-

---

[12]One of the factors the trial court is directed to consider when determining the best interest of a child in custody disputes is "[t]he reasonable preference of the child if twelve (12) years of age or older." Tenn. Code Ann. § 36-6-106(a)(7).

schooled. Sammy testified that his very best friend was a boy who was being home-schooled. But he also called a fellow-student at Brentwood Middle School his best friend, and he testified that when he is at Father's house, Father lets Sammy's friends stay there overnight. Sammy admitted that he sometimes has fun at his Father's house. Asked, "[d]o you love your mom and dad?" He answered "yes."

Like his sister, however, when he was asked what he was most scared of, he answered "living with my Dad." Asked why, he responded "Because I feel that would destroy my life and my potential to do what I need to do." Questioned how his life would be destroyed by living with his father, he stated that "I would never get to do home-schooling and home-schooling could really help me in politics." Sammy is very interested in politics. He has worked in the campaign of a former congressman, and he hopes to become president some day.

Tammy O'Rourke testified that she has been happily married to Father for three years. She stated that Father is a good stepfather to her four daughters, whose ages are seventeen, fifteen, eight and six, and that he is not abusive to them, to his own children, or to her. She observed that when Sammy and Caroline come over to visit, it takes a while for them to warm up, especially Caroline. She also testified that she has tried to communicate with Mother, but that Mother doesn't answer the phone, doesn't return phone calls, and doesn't respond to e-mails.

Nineteen year old Daniel O'Rourke testified that before he moved from Mother's house to Father's, Mother kicked him out of her house again and again whenever he didn't do whatever she told him to, and that he sometimes had to ask neighbors to intercede for him before he was allowed to return. He also testified that Mother bought him a new Mercedes when he turned sixteen, but didn't let him keep it when he moved in with Father, telling him that he could have it only if he returned to live with her.

Nonetheless, Daniel preferred to remain with Father because "[t]he pressure of the divorce didn't seem so strong there. I could actually live as a kid at my dad's house and make mistakes and not be thrown out for them. Have two parents, you know co-existing, you know, a relationship, a little less yelling." He testified that his relationship with Tammy O'Rourke was good, that he had never witnessed any abuse at Father's house and that there was less conflict at Father's house than at Mother's. When he was asked where it would most benefit Katie, Caroline and Sammy to live, he answered "at my dad's house."

Daniel also testified that when he started living with Father, he was allowed to visit with Mother any time he wanted, but that when he was living with Mother, he was not free to visit Father. He stated that Father encouraged Daniel to go see Mother, to be respectful

to her and to call her. Conversely, he stated that Mother's attitude was "[i]f you're not with me, you're with your father or against me." He also testified that when he lived with Mother, he was usually not allowed to take phone calls from Father, because she always found reasons for him not to, such as being engaged in Bible Search, at dinner, or having homework to do. In contrast, Mother always answered the phone when Shawn Sanders called, no matter what else was going on.

When the defense called Shawn Sanders to the stand, her testimony painted a very different picture of the family situation than did the testimony of Daniel and other family members. She claimed that Father was an unrepentant child abuser, and that she had made it her mission in life "to prevent my brothers and sisters from experiencing the childhood that I experienced." To that end, she talked to eight of the attorneys Mother had retained since the divorce, and she contacted a social worker at the Florida Department of Children's Services to give her information about alleged child abuse by Father.

Ms. Sanders testified that she was very close to Mother, that they talk on the phone every day about everything, and that she talks to Caroline frequently. She stated that Mother is a wonderful nurturing parent who is not afraid to try to lead the children down the right path, and that she has never known Mother to isolate Sammy or Caroline from other people, not even Father. She also admitted that she and her husband had both been arrested for domestic violence against each other, and that they had attended a program for batterers.

**D. The Court's Ruling**

The trial court's decision is found in a detailed Memorandum Opinion, filed July 10, 2007, and a Final Order, dated July 13, 2007. In the opinion, the court first discussed the testimony at trial in regard to the question of whether there had been a material change of circumstances for each of the children, since the final decree of divorce, which affected their material well-being in a meaningful way. *See* Tenn. Code Ann. § 36-6-101(a)(2)(B); *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002).

Among the changes found by the court were the improvement in Katie's behavior under Father's supervision and the loss of her relationship with her Mother as a result of Mother's total rejection of her after she moved to Father's house. The court acknowledged that Caroline and Samuel had stated that they preferred to remain with Mother, but it expressly found that those preferences "have been unduly influenced by Ms. O'Rourke." The court noted that the evidence showed that the children were doing well in school and that, contrary to their testimony, they enjoyed their time with Father, but that they had learned from their observations of what happened with Daniel and Katie that they would be subjected to what amounts to excommunication by Mother if they showed any preference towards

Father.

The court then moved on to an analysis of the best interest of the children, in accordance with the factors set out in Tenn. Code Ann. § 36-6-106(a). The court discussed a number of the statutory factors which indicated that it would be in the best interest of the children for Father to be named as their primary residential parent, but the one it found most significant was "each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child." Tenn. Code Ann. § 36-6-106(a)(10).

The court declared that it found that Mother was determined to prevent the children from enjoying a positive relationship with Father and that she had used home-schooling to achieve that very purpose. The court also found the testimony of Shawn Sanders not to be worthy of belief and that there was no credible evidence of any physical abuse of any child in this case, but that "these three children are being emotionally abused by Ms. O'Rourke."

Turning to the testimony of Dr. Geffner, the court declared that he had adopted Mother's "scorched earth" tactics by not only attacking the conclusions of Dr. Bernet and Dr. Walker, but also their ethics. The court stated that Dr. Geffner's testimony was ". . . completely without merit and that he truly fits the definition of a 'hired gun.'" In light of Mother's "relentless attempts to convey her bad opinion of their father to these children," the court concluded that the only possible way for the children to have a relationship with both parents would be for them to be with Father.

The court accordingly designated Father as the primary residential parent of the three minor children, with the authority to make all major decisions for their welfare. A new parenting plan was adopted, which included standard visitation for Mother. The court also found that the services of the parent coordinator were no longer needed and would be terminated. Mother was found in willful criminal contempt for failing to follow the directives of the parenting plan. Father was awarded attorney fees in the amount of $330,799.86. After the court disposed of the parties' subsequently-filed motions to alter or amend, the stage was set for this appeal.[13]

_____

[13]Wife's motion to alter or amend was denied. Father's motion to alter or amend was denied in part and granted in part, with small adjustments made to the court's previous order, primarily relating to financial issues.

## IV. MOOTNESS OF SOME ISSUES

This court consolidated Mother's appeals and entered an order narrowing the issues that could be raised. That order recognized that the trial court's July 13, 2007 order superceded many of the trial court's decisions that were the subject of Mother's other pending appeals.

> [T]he court has determined that the current appeal is moot to the extent the appellant is seeking relief from orders which have been superceded. In light of the complexity of the record and out of an abundance of caution, however, we will not prohibit the appellant from raising issues regarding . . . orders . . . to the extent those issues are relevant to the appeal of the July 13, 2007 order . . . and are raised in support of relief other than reversal of the orders which have been superceded.

Accordingly, the trial court's order entered July 13, 2007, and any other previous orders that were not superceded by that order, are the subject of this consolidated appeal. In the July 2007 order, the trial court ordered that Father would have "sole custody" of Katie, Caroline, and Sammie, and adopted Father's modified parenting plan, essentially making Father the primary residential parent. The court also terminated the services of the parent coordinator, ordered payment of his fees, and held Mother in contempt for failing to follow the parenting plan, but declined to impose sanctions for that contempt.

In her brief, Mother raises a number of issues. The first question, however, is whether any of those issues were mooted by the July 2007 order. A case will be considered moot if it no longer serves as a means to provide some sort of relief to the party who may prevail or if it no longer presents a present, live controversy. *State v. Ely*, 48 S.W.3d 710, 717 n.3 (Tenn. 2001); *County of Shelby v. McWherter*, 936 S.W.2d 923, 931 (Tenn. Ct. App. 1996). A case is not justiciable if it does not involve a genuine, continuing controversy requiring the adjudication of presently existing rights. *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 193 (Tenn. 2000); *Ford Consumer Fin. Co. v. Clay*, 984 S.W.2d 615, 616 (Tenn. Ct. App. 1998).

> A moot case is one that has lost its justiciability because it no longer involves a present, ongoing controversy. *McCanless v. Klein*, 182 Tenn. 631, 637, 188 S.W.2d 745, 747 (1945); *County of Shelby v. McWherter*, 936 S.W.2d 923, 931 (Tenn. Ct. App.1996). A case will be considered moot if it no longer serves as a means to provide some sort of judicial relief to the prevailing party. *Knott v. Stewart County*, 185 Tenn. 623, 626, 207 S.W.2d 337, 338-39 (1948); *Ford Consumer Fin. Co. v. Clay*, 984 S.W.2d at 616. Determining whether a

case is moot is a question of law. *Charter Lakeside Behavioral Health Sys. v. Tennessee Health Facilities Comm'n*, 2001 WL 72342, at *5; *Orlando Residence, Ltd. v. Nashville Lodging Co.*, No. M1999-00943-COA-R3-CV, 1999 WL 1040544, at *3 (Tenn. Ct. App. Nov.17, 1999) (No Tenn. R. App. P. 11 application filed).

*Alliance for Native American Indian Rights in Tenn., Inc. v. Nicely*, 182 S.W.3d 333, 338 (Tenn. Ct. App. 2005).

First, Mother challenges the trial court's pre-2007 denial of her Rule 60.02 motion which sought to vacate the existing parenting plan(s), including the initial plan.[14] The July 2007 order established a final parenting arrangement, and Mother may, and has, challenged that order. However, the prior parenting plans have been replaced, or superceded, and are no longer in force. We can discern no relief we could grant to Mother at this stage of the proceedings even if we considered the trial court's Rule 60 decision. Consequently, the correctness of the trial court's decision on the Rule 60.02 motion is moot.

Mother also challenges the appointment and role of the Parent Coordinator.[15] The July 2007 order dismissed the coordinator and established a new parenting plan based upon evidence presented to the court. In other words, the plan now in effect was not decided by the Parent Coordinator. Again, we cannot provide any relief to Mother based upon the parent coordinator's actions since those have been replaced by the July 2007 order. Consequently, challenges to the role of the Parent Coordinator or his conduct are now moot.

---

[14]Specifically, "the trial court erred as a matter of law in denying Ms. O'Rourke's T.R.C.P. Rule 60.02 motion to vacate the April 17, 2001, Final Judgment/Parenting Plans, and all subsequent parenting plans." Mother claims that all the parenting plans entered in this case are void, because the trial court failed to include with its orders adopting such plans written findings of fact to show that it complied with the requirements of Tenn. Code Ann. § 36-6-407(a)(1)-(a)(3).

[15]Mother argues, *inter alia*, that appointment of the Parent Coordinator denied her access to the courts by unlawfully delegating judicial authority to a non-judicial entity. Indeed, this court has expressed concern about attempting to delegate to a "Parenting Coordinator" or any other similarly titled person, whose role and scope of authority do not appear in statute or rule, the authority to modify an existing court order regarding residential placement. Father notes that Mother did not initially object to the appointment of a Parent Coordinator, that she did not appeal the trial court's order directing that appointment, and that she participated in the selection of Dr. Thomas. Father also asserts that the record also shows that Mother initially cooperated with the Parent Coordinator, and only challenged his authority after he began questioning the value and the effectiveness of Mother's home-schooling for the children. In view of our conclusion that the trial court's last order rendered any challenges to the coordinator's appointment or actions moot, we need not address these issues.

## V. CHALLENGES TO CURRENT ORDER

The order that is the subject of this appeal designated Father as the primary residential parent of the three minor children, with the authority to make all major decisions for their welfare. A new parenting plan was adopted, which included standard visitation for Mother.

On appeal, Mother does not directly challenge the correctness of the trial court's residential placement determination. In other words, she does not argue that the trial court's findings are not supported by a preponderance of the evidence. Nor does she argue that the trial court incorrectly applied the standards for determining whether a material change of circumstance was shown or the statutory factors applicable to a best interest analysis.

The trial court issued a thorough and detailed Memorandum Opinion in which the court made a number of factual findings and explained its reasoning. While Mother has not directly challenged the court's findings, we believe it is important to resolution of Mother's challenges to set out a few of the trial court's statements and findings.

The court made a specific finding that the three youngest children were being emotionally abused by Mother. Additionally, the court stated, "This Court, along with Dr. Burnet, is very concerned with her relentless attempts to convey her bad opinion of their father to these children."

With regard to Mother's handling of the discovery of dangerous or inappropriate behavior by Katie, the court found that Mother had shown a lack of concern for her daughter, and also found:

> Rather than going to Katie and addressing these serious problems, Ms. O'Rourke was much more interested in using this information to gain an advantage for herself in this legal dispute. To date, Ms. O'Rourke has not had any meaningful discussions with Katie about these concerns. The Court finds Ms. O'Rourke's actions appalling. . . . What is important to the court is that Mr. O'Rourke took action to address two of the biggest threats to a child's development, sex and drugs.

The court repeated that it had earlier found that Mother had used home-schooling as a method to isolate the two younger children from their father. The court also found, "Her goal is to restrict the children's contact with their father as much as possible." The court also found that Mother had indoctrinated the children with her bitterness toward Father and that their preferences had been unduly influenced by Mother, explaining, "As they have observed with their siblings, Katie and Daniel, they know they will be subjected to what amounts to

excommunication by Ms. O'Rourke if they show any preference toward their father."

The court additionally found:

Ms. O'Rourke has made it plain that she will not have any meaningful communication with Mr. O'Rourke regarding the children; that she will not have any meaningful discussions with Dr. Thomas regarding the children (unless Dr. Thomas does what she wants); that she will continue to indoctrinate the children that Mr. O'Rourke is an evil and dangerous person; and that she will do everything in her power to restrict his access to his children.

**A. Tenn. Code Ann. § 36-6-406**

Mother contends that the trial court erred in naming Father primary residential parent, arguing that such an award is barred by Tenn. Code Ann. § 36-6-406, which reads in relevant part,

(a) . . . a parent's residential time as provided in the permanent parenting plan or temporary parenting plan shall be limited if it is determined by the court, based upon a prior order or other reliable evidence, that a parent has engaged in any of the following conduct:
(1) . . .
(2) Physical or sexual abuse or a pattern of emotional abuse of the parent, child or of another person living with that child as defined in § 36-3-601.

The trial court herein did not determine that Father had engaged in abuse based upon a prior order. Mother does not assert the existence of a prior order requiring the limitation she argues to be applied. As we read the trial court's July 10 order, the court did not make a finding of abuse based on evidence presented, either. The court specifically found there was no proof of abuse of any of the children by Father, and Mother relies on a statement made by the court indicating it was aware of domestic abuse during the marriage. The court did address Mother's new argument based on the above statute, finding:

. . . Ms. O'Rourke's capacity for rational thought has been overwhelmed, if not suborned, by her angry preoccupation with the current parenting dispute. She accused Mr. O'Rourke of both physical and sexual abuse of the children, but provided no facts or explanations to support these serious allegations . . . she has become irrational and overly aggressive in trying to get the upper hand

-19-

with Mr. O'Rourke. Ms. O'Rourke's stated objective to restrict Mr. O'Rourke's access to the children as much as possible is underscored by her proposed Parenting Plan, by which she would limit Mr. O'Rourke to thirty days a year with only two hours of supervised supervision visitation on each day. Although Ms. O'Rourke has failed to articulate, much less prove, any incident of physical or sexual abuse by Mr. O'Rourke toward his children, . . . she wishes this court to impose these heavy restrictions. Her only reason for requesting restrictive visitation is based upon her recent discovery of the existence of T.C.A. § 36-6-406, which she now wants to apply retroactively, despite the fact the parties have operated pursuant to an unrestricted parenting plan for the last six years. Her proposal is the ultimate example of the irrational and over-aggressive behavior described by Drs. Walker and Burnet.

It is important to note that Mother has made no assertion that Father has abused her since the filing of the complaint for divorce. The parties' divorce was granted in April of 2001 on the ground of irreconcilable differences. In accordance with the statutory restrictions on such divorces, the parties agreed to a parenting arrangement which became part of the final decree of divorce. That agreed-upon arrangement gave Father custody of one of the parties' children and regular unsupervised visitation with the others. The record indicates there was no hearing regarding other grounds for divorce and, therefore, no proof taken regarding any alleged domestic abuse. In the first paragraph of the final decree, the trial court acknowledged that the parties "have made adequate and sufficient provision by written agreement for the custody and maintenance of any children of that marriage and for the equitable settlement of any property rights between them."

In 2002 Mother again entered into an agreement regarding custody and visitation. An Agreed Order and Amended Parenting Plan were entered in August of 2002. No limitations were placed on Father's residential parenting or visitation with the children, and there is nothing to indicate Mother raised any issue or concern about abuse during the marriage.

Thus, at earlier points in the litigation, not only did Mother fail to assert that Father's time with the children should be limited because of alleged domestic abuse during the marriage, she affirmatively agreed to him having custody and unrestricted visitation. Consequently, Mother has waived the issue of the application of Tenn. Code Ann. § 36-6-406. Even if that issue was not waived, however, there are other valid reasons to support the trial court's decision not to limit Father's parenting time on the basis of the statute.

Mother would like us to read Tenn. Code Ann. § 36-6-406 as absolutely barring any parent from being named as the primary residential parent of a child if that parent has any history of abuse, no matter the degree of abuse involved or its remoteness in time. Both the legislature and the courts take domestic abuse very seriously, as they should. We do not believe, however, that the legislature intended the statute to be applied so broadly as to deprive the trial court of its discretion to make custody determinations in accordance with the best interest of the children, based upon the factual situation that exists at the time of that determination.

In the case before us, the trial court found that Mother was emotionally abusing the children and that remaining in her primary custody was not in their best interests. Based on our review of the record, we conclude that the evidence does not preponderate against these findings. To reverse the trial court's parenting plan order and require the children to remain with Mother while having very limited interaction with Father would not be in their best interests and would be contrary to the specific legislative directive that such decisions be made with those best interests as the primary goal. A number of years have passed since the parties' initiation of the divorce proceedings, and the parents have demonstrated very different approaches and behaviors in the intervening years. A court making critical decisions about parenting arrangements must be able to consider such developments.

Mother relies upon the case of *Burden v. Burden*, 250 S.W.3d 899 (Tenn. Ct. App. 2007) as an example of the proper application of Tenn. Code Ann. § 36-6-406. In that case, this court reversed the trial court's decision to equally divide parenting time with an eleven year old girl between the mother and the father. On appeal, we designated the mother as the primary residential parent, allowing the father to exercise only standard visitation. Our discussion in that case included a citation to Tenn. Code Ann. § 36-6-406 and descriptions of a number of incidents of physical abuse perpetrated by Mr. Burden against his wife.

A fair reading of that case shows, however, that Mother's reliance on it is misplaced. We found that the primary error of the trial court in *Burden* was its failure to give first priority to the best interest of the child and, instead, to show an unnecessary solicitude for the father's feelings. Further, Mr. Burden's abuse of his wife was only one of several factors that led us to conclude that it was in the best interest of the child that her mother be named as her primary residential parent. Other factors included the father's emotional and psychological problems, which prevented him from being an engaged parent or establishing a close relationship with his daughter, and his apparent lack of interest in the child.

Expert psychological evidence testimony played a role in the *Burden* case, as it did in the one before us, but the trial court's treatment of that evidence was another reason justifying our reversal of its determination in the *Burden* case. The trial court had asked for

a psychological evaluation of the parties and assured them that the court would be guided by the results of that evaluation. When the psychologist recommended that the mother be named as the primary residential parent, the trial court ignored the report, notwithstanding the fact that there was no evidence placing into question the psychologist's qualifications or credibility.

We observed in *Burden* that when a witness testifies at trial, the trial court's conclusions as to the witness's credibility are entitled to great weight on appeal, because the court had the opportunity to see and hear the witness and to observe his manner and demeanor on the stand. *Burden*, 250 S.W.3d at 905 (citing *Massengale v. Massengale,* 915 S.W.2d 818, 819 (Tenn. Ct. App. 1995)); *Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991). But the psychologist's opinion in *Burden* was delivered in the form of a written report, and we concluded that we were not required to accord the trial court's decision a presumption of correctness under Tenn. R. App. P. 13(d) because we were in the same position as the trial court in evaluating that evidence. *Burden*, 250 S.W.3d at 905 (citing *Krick v. City of Lawrenceburg*, 945 S.W.2d 709, 712 (Tenn. Ct. App. 1997)).

By contrast, in the present case Dr. Bernet performed a psychological evaluation of Mother and Father, and he testified at trial that Father was better suited for parental responsibilities than Mother. Dr. Geffner also testified at trial, and he attacked the methods Dr. Bernet used to reach his conclusion. Two other psychologists who had direct contact with the parents and/or the children testified by deposition. They agreed with Dr. Bernet and concluded that it was in the best interest of the children that Father be designated as their primary residential parent.

The trial court found the testimony of Drs. Bernet, Walker and LaBarbera to be persuasive, but it did not find Dr. Geffner's testimony credible. Nor did it find the testimony of Shawn Sanders to be credible. As we noted above, the trial court's conclusions as to a witness's credibility are entitled to great weight on appeal. In sum, the trial court adopted a parenting plan that was consistent with the testimony of the witnesses that it found to be most credible. The evidence does not preponderate against the trial court's determination.

The trial court did not improperly fail to apply Tenn. Code Ann. § 36-6-406. The trial court's findings are supported by the preponderance of the evidence and based upon application of correct legal principles. The order changing primary residential placement is affirmed.

**B.  The Discovery Sanctions**

Mother objects to the discovery sanction that limited the testimony of her expert witness, Dr. Robert Geffner, whom she describes as "a psychologist and preeminent nationally acclaimed authority on domestic violence."  Setting aside the question of Dr. Geffner's credentials, we note that the trial court imposed the sanction because of Mother's failure to participate in the discovery process in good faith.

Father submitted interrogatories asking Mother to reveal the identity of all the experts she intended to call upon and the issues each would be testifying about.  Mother first spoke to Dr. Geffner early in November of 2006.  On December 31, 2006, she first provided his name and his CV to Father's attorney, but no other information, thereby making it difficult or impossible to obtain a timely deposition from him.  The trial court found that Mother and/or her attorney consistently procrastinated in responding to discovery requests, that they withheld information from Father in an attempt to gain an advantage over him, and that the delay over Dr. Geffner's opinions was just the latest example of that tactic.

Trial courts have the authority to take whatever action is necessary to prevent discovery abuse, and they have wide discretion to determine the appropriate sanction to be imposed. *Mercer v. Vanderbilt University, Inc.,* 134 S.W.3d 121, 133 (Tenn. 2004) (citing *Lyle v. Exxon Corp.,* 746 S.W.2d 694, 699 (Tenn. 1988)); *Strickland v. Strickland*, 618 S.W.2d 496, 501 (Tenn. Ct. App. 1981).  "Appellate courts should allow discretionary decisions to stand even though reasonable judicial minds can differ concerning their soundness." *White v. Vanderbilt University,* 21 S.W.3d 215, 223 (Tenn. Ct. App.1999) (citing *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn. Ct. App.1999)).

Despite the trial court's announced sanction, it gave Dr. Geffner a great deal of latitude in his testimony at trial, even in the face of continued objections by Father's attorney.  During almost a full day of testimony, the witness was able to fully express his criticisms of the purported defects in the evaluations performed by the other psychiatrists and psychologists in this case, and his opinions of the relative fitness of the parties for parental responsibilities, even though he never met Father.

The trial court ultimately found that Dr. Geffner was simply a "hired gun" and that his testimony was completely without merit.  In light of the deference that the appellate court is required to give to the credibility determinations of the trial court, it appears unlikely to us that any additional testimony that Dr. Geffner might have been allowed to give would have had any effect on the ultimate outcome of this case.  We find that the trial court acted within its discretion by imposing a discovery sanction on his testimony and that, in any event, Mother has not demonstrated how his testimony was in fact limited in a way that affected the

outcome.

## VI. ATTORNEY FEES

Tennessee Code Annotated § 36-5-103(c) vests the trial court with the authority to award attorney fees in child custody cases "in the discretion of such court." When attorney fees are awarded in custody cases, they usually go to the successful litigant, so long as the award is just and equitable under the facts of the case. *Sherrod v. Wix*, 849 S.W.2d 780, 785 (Tenn. Ct. App. 1992). In this case, the trial court found Mother in criminal contempt for failing to comply with the requirements of the parenting plan, including failing to allow Father to have unimpeded phone conversations with his children and failing to furnish him with an itinerary when she left the state with the children. Father incurred substantial attorney fees because of the need to vindicate his parental rights in the face of Mother's unrelenting hostility to his exercise of those rights.

The parties' marital dissolution agreement also contained a provision stating that the prevailing party would be entitled to attorney fees in an action to enforce any provision of the agreement. Such fee provisions in an MDA are generally enforceable, and they are subject to the usual rules of contract interpretation. *See Elliott v. Elliott,* 149 S.W.3d 77, 88-89 (Tenn. Ct. App. 2004); *Gray v. Estate of Gray,* 993 S.W.2d 59, 63 (Tenn. Ct. App. 1998); *Moore v. Moore,* No. M2004-00394-COA-R3-CV, 2007 WL 2456694 at *4 (Tenn. Ct. App. Aug. 29, 2007) (no Tenn. R. App. P. 11 application filed). Thus, there was both a statutory and a contractual basis for the trial court's order for Mother to pay Father's attorney fees, at least with regard to Mother's failure to comply with the existing parenting plan.

Additionally, Tennessee Code Annotated § 36-5-103(c) provides authority for the award of fees with regard to the modification of the parenting plan. Mother contends that the court's award of attorney fees to Father was inequitable and unreasonable. She claims that most of the litigation in this case was generated by Father, because of his "relentless filings requesting changes in the parenting schedule." However, the court declared that most of the blame for those "astronomical" fees should be placed on Mother. The court stated that "Ms. O'Rourke has consistently done everything in her power to hinder, delay and obstruct the legal process in this case." After a thorough immersion in the records of this case, we find no basis to disagree with the trial court, and we find that it acted within its discretion in awarding Father his attorney fees and in the amount thereof.

## VII.

The judgment of the trial court is affirmed.  We remand this case to the Chancery Court of Williamson County for any further proceedings necessary.  Tax the costs on appeal to the appellant, Cydnie Browning O'Rourke.


_____
PATRICIA J. COTTRELL, JUDGE