# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### December 10, 2012 Session

## STEPHEN S. PATTERSON, II. v. SUNTRUST BANK, EAST TENNESSEE

### Appeal from the Circuit Court for Blount County
### No. L15908    Hon. David Reed Duggan, Judge

---

### No. E2012-01371-COA-R3-CV-FILED-JANUARY 11, 2013

---

This case was filed pursuant to the Electronic Funds Transfer Act. Customer sought reimbursement from Bank for unauthorized transactions made using a debit card linked to his account. Bank limited reimbursement to the transactions that occurred prior to and within 60 days of the transmittal of the bank statement that revealed the first unauthorized transaction. Customer filed suit. The trial court upheld Bank's denial of recovery, finding that Customer's failure to review his bank statements resulted in losses beyond the 60-day time period. Customer appeals. We affirm the decision of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., P.J., and D. MICHAEL SWINEY, J., joined.

Gerald C. Russell, Rockford, Tennessee, for the appellant, Stephen S. Patterson, II.

Christopher W. Martin, Knoxville, Tennessee, for the appellee, Suntrust Bank, East Tennessee.

### OPINION

### I. BACKGROUND

Stephen S. Patterson, II ("Customer") opened a combination personal and business checking account with Suntrust Bank, East Tennessee ("Bank") in Alcoa, Tennessee on December 20, 1999. On that day, Customer was told that he would receive a debit card in

the mail. When Customer received his debit card, he validated it and then used it to make purchases.

In July 2005, Customer and Juanita Wehrman entered into a romantic relationship. At some point during Customer's relationship with Ms. Wehrman, Bank mailed Customer another debit card. Ms. Wehrman stole the debit card and made her first unauthorized purchase with the card on August 22, 2005. While Customer continued to use his card, Ms. Wehrman used the replacement card for approximately 16 months, well beyond the longevity of their intermittent romantic relationship.

On December 4, 2006, Customer was depositing money into his account at Bank when an employee jokingly chided him for his extravagant shopping trip in Indiana that weekend. Knowing that he had not visited Indiana, Customer entered the bank to speak with an employee. While speaking with the employee, Customer's card was used to make another purchase in Indiana. The employee closed Customer's account to prevent any further unauthorized transactions. Customer discovered that Ms. Wehrman had used his replacement debit card to make unauthorized purchases in excess of $30,000.

Customer sought reimbursement from Bank. Relying on 15 United States Code Annotated section 1693g, Bank limited its reimbursement to $677.46. Bank insisted that it was only required to reimburse Customer for the amount of unauthorized transactions that occurred prior to and within 60 days of the transmittal of the bank statement that revealed the first unauthorized transaction. Customer also received $500 in restitution from Ms. Wehrman. Customer filed suit against Bank in an effort to recoup the remainder of his loss from Ms. Wehrman's fraudulent use of his account.

A bench trial was held at which Customer and Stephanie Hardiman, a bank employee testified. Customer testified that the employee who opened his checking account told him that he would not be held "liable or responsible" for unauthorized transactions. He admitted that other than the employee's assurance regarding his liability, he could not recall exactly what the employee told him when he opened the account. He related that the employee instructed him to sign certain documents, including a signature card. The signature card provided, in pertinent part,

> It is agreed that all transactions between the Bank and the entity listed in the above Account Title ("Depositor") shall be governed by the rules and regulations for this account and the above signed as the authorized agent(s) of the Depositor hereby acknowledge(s) receipt of such rules and regulations and the funds availability policy. The Depositor also acknowledges the funds availability policy has been explained.

Customer could not recall reading the signature card and insisted that he never received the rules and regulations or the funds availability policy mentioned in the document.

Customer testified that he was not given any documentation when he opened his account. He also never received any disclosures in the mail regarding his potential liability for unauthorized transactions. He said that after opening the account, he received a box of checks and a debit card in the mail. He stated that the debit card was attached to a document similar to one he offered into evidence, which provided, in pertinent part,

> You are protected if your card is ever lost or stolen. You are not responsible for unauthorized purchases.

The document also provided,

> Use of this card is subject to the terms and conditions of your current Customer Agreement.

He related that the debit card also provided that he was not liable or responsible for any unauthorized purchases. He introduced two additional documents, bearing the same limitation of liability. The first document also advised that use of the card was subject to his user agreement, while the second document did not mention the terms and conditions governing the debit card. However, a debit card, which was left attached to the second document, provided, in pertinent part,

> The cardholder and any other authorized users by signing this agrees to all [Bank] terms and conditions agreement(s) governing this card.

Relative to the theft of his replacement card, Customer testified that he dated Ms. Wehrman "on and off," starting in July 2005. He admitted that she "occasionally" stayed overnight in his home and had access to his mail and home office. He insisted that Ms. Wehrman did not take the debit card that he regularly used. He surmised that she must have stolen a replacement card from the mailbox while he was not home. He asserted that he never consented to Ms. Wehrman's use of his replacement card.

Customer used his checking account for personal and business purposes. He admitted that he received monthly statements documenting his account activity. He stated that he opened the statements, glanced at them, and then filed them for later use. He never used the statements to balance his account. He related that he gave the statements to his accountant, who filed his income tax return each year. He acknowledged that the number of Ms. Wehrman's transactions steadily increased throughout her unauthorized use of the

replacement card and that as a result of her increased purchases, his monthly bank statements spanned several pages. He admitted that the statements reflected the location of each purchase and that some of the unauthorized transactions occurred in North Carolina and Indiana. He conceded that he would have noticed that someone else was using his account if he had simply reviewed his statements.

Ms. Hardiman, a vice president of corporate security at Bank, testified that she had been employed at Bank for 17 years. She related that she investigated claims of fraud, forgery, and external or internal misappropriation of funds. She was responsible for monitoring a large geographic area, including Blount County. As a result of her training and position, she was familiar with the basic way in which Bank opened and maintained checking accounts. She was also familiar with the way in which Bank maintained its records. Following voir dire, she was qualified as a custodian of records for purposes of this case.

Ms. Hardiman testified that generally, customers are required to provide a social security number and sign a signature card in order to open a checking account. She stated that customers are either given a copy of Bank's rules and regulations at the time the account is opened or they receive the pertinent documents in the mail after the account is opened. She asserted that if a customer elects to receive a debit card, a card is sent in the mail, along with the rules and regulations relating to the use of the actual card. She stated that each time a replacement or renewal card is sent, the customer receives another copy of the rules and regulations relating to the card. She related that debit cards are replaced every three years. She admitted that the department that oversees the creation of the rules and regulations is located in Atlanta, Georgia and that the company that mails the debit cards is located in a different state. She asserted that the Atlanta Department is responsible for ensuring that the pertinent documents are included with the debit cards when the cards are mailed. The 2002, 2004, 2005, and 2006 rules and regulations were introduced into evidence as a collective exhibit. The documents provided, in pertinent part,

> If you do NOT tell us within two (2) business days after learning of the loss or theft of the electronic terminal access card or code, or preauthorized Telephone Funds Transfer code, and we can prove that we could have prevented someone from using the card or code without your permission had we been notified, you could lose as much as $500.

> If your statement shows transfers you did not make, tell us at once. If you do not tell us within sixty (60) days after the statement was mailed, you may lose all of the money transferred after the sixty (60) days if we can prove that we could have prevented the loss had you told us in time.

We will extend the time periods for a good reason, such as a long trip or hospital stay, which might keep you from notifying us.

In accordance with Visa guidelines, SunTrust Check Card holders are not liable for unauthorized Visa merchant transactions performed with their SunTrust Check Cards if the card is reported lost or stolen within two days (48 hours) of discovery. After two days, there is a maximum liability of $50.

She admitted that she did not know whether the rules and regulations were sent with Customer's debit card or with any of his replacement or renewal cards. She also acknowledged that she was not present when Customer opened his account and could not state whether he received a copy of the rules and regulations at that time.

Ms. Hardiman explained that customers who elect to receive a debit card also receive a personal identification number ("PIN") that is to be used with the card. She related that a card can be used in one of two ways, either the customer enters the PIN each time he or she makes a purchase or the customer simply signs his or her name at the time of the purchase. She stated that the PIN remains the same even when customers receive replacement or renewal cards. She admitted that a customer could request a new PIN.

Ms. Hardiman testified that if a customer were to report unauthorized transactions within 60 days of the first transaction reflected in the monthly statement, Bank would have closed the checking account, blocked the cards associated with the account from future use, and reimbursed the customer in full. She acknowledged that she would not have been involved with Customer's case if he had notified Bank of the unauthorized transactions in a timely manner. She explained that she learned of Customer's case because of the time frame of the unauthorized activity and the amount of money that was stolen.

Following the presentation of the above evidence, the trial court dismissed Customer's complaint. The court found Ms. Hardiman's testimony credible and noted that the disclosures provided by Bank were compliant with federal regulations. The court also found that Customer was negligent for failing to review his monthly statements, that he "put [Ms. Wehrman] in the position of having access to his debit card, or at least to intercept a replacement card," and that he offered "no proof" regarding the claim that the card used by Ms. Wehrman was not validated. The court acknowledged the general limitation of a customer's liability found in the applicable law, the disclosure statements, and on the documents provided by Bank. However, the court stated that the applicable law and disclosures provided "an exception to that limitation of liability where an account holder is not diligent in monitoring his periodic bank statements, and where the account holder fails to report to the bank what are very clearly unauthorized charges." The court concluded,

[Customer] was negligent in failing to review his monthly account statements, and it was as a result of that negligence that he has suffered this loss. [Bank] simply cannot be held liable for unauthorized transactions which were clearly disclosed on the face of his bank statements. It may be true that [Customer] did not become aware of these unauthorized transactions until [December 4, 2006], when he went through the drive-through window at [Bank]. He should have known of these charges to his account, however, as soon as these charges, being made in locations where [Customer] had never been, showed up on his bank account statements. The [c]ourt will charge him with knowledge of what a reasonable, diligent person should have known.

The [c]ourt also concludes, based upon all of the facts it has found and the law cited herein, that [Bank] established that these unauthorized transactions would not have occurred had [Customer] notified [Bank] within the applicable 60-day period; [Bank] has established that it could have prevented the loss had [Customer] told [Bank] in time.

Finally, to the extent, if at all, [Customer] intends to argue that the 60-day period should have been extended due to extenuating circumstances, he has offered no proof of any such circumstances.

This timely appeal followed.

## II. ISSUES

We consolidate and restate the issues raised on appeal as follows:

A. Whether Customer may be held liable for Ms. Wehrman's unauthorized transactions.

B. Whether the trial court erred in upholding Bank's limitation of Customer's recovery because he failed to notify Bank of the unauthorized activity within the applicable time period.

### III. STANDARD OF REVIEW

On appeal, the factual findings of the trial court are accorded a presumption of correctness and will not be overturned unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d). The trial court's conclusions of law are subject to a de novo review with no presumption of correctness. *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Mixed questions of law and fact are reviewed de novo with no presumption of correctness; however, appellate courts have "great latitude to determine whether findings as to mixed questions of fact and law made by the trial court are sustained by probative evidence on appeal." *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995).

### IV. DISCUSSION

#### A.

The Electronic Funds Transfer Act ("the EFTA"), as represented in the United States Code ("the USC") and the Code of Federal Regulations ("the CFR"), delineates the rights, responsibilities, and liabilities of participants in the banking industry. 15 U.S.C. § 1693(b); 15 C.F.R. § 205.1(b). Pursuant to the EFTA, a consumer may only be held liable for unauthorized transactions involving his or her account if the financial institution provided the pertinent disclosures of liability, if the account was accessed using an accepted device, and if the issuer of the accepted device provided a means whereby the user can be identified as the person authorized to use the device. 15 U.S.C. § 1693g(a); 12 CFR § 205.6(a).

#### I.

Customer asserts that he never received the disclosures of liability. He contends that the disclosure documents and Ms. Hardiman's testimony regarding Bank's policies and procedures for providing the documents were inadmissible. Bank responds that the documents and the testimony were admissible.

When Customer opened his account, he signed a document in which he acknowledged receipt of Bank's rules and regulations, namely the disclosure documents. Additionally, any issues relating to the admission of the disclosure documents are waived because he did not object when the documents were admitted into evidence. Tenn. R. App. P. 36(a) (providing that failure to contemporaneously object to the admission of inadmissible hearsay testimony results in waiver of the issue on appeal). Lastly, his arguments relating to Ms. Hardiman's testimony are misplaced.

Customer contends that Ms. Hardiman was not properly qualified as a custodian of records, thereby invalidating her testimony relating to Bank's policies and procedures because her statements were inadmissible hearsay. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is inadmissible in trial court proceedings unless it falls within one of the recognized exceptions to the hearsay rule. Tenn. R. Evid. 802; *Mitchell v. Archibald*, 971 S.W.2d 25, 28 (Tenn. Ct. App. 1998).

Generally, a custodian of records must be presented to introduce

[a] memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses *made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit* if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation[.]

Tenn. R. Evid. 803(6) (emphasis added). Documents are admissible pursuant to this rule when the following criteria are met:

1. The document must be made at or near the time of the event recorded;

2. The person providing the information in the document must have firsthand knowledge of the recorded events or facts;

3. The person providing the information in the document must be under a business duty to record or transmit the information;

4. The business involved must have a regular practice of making such documents; and

5. The manner in which the information was provided or the document was prepared must not indicate that the document lacks trustworthiness.

*Alexander v. Inman*, 903 S.W.2d 686, 700 (Tenn. Ct. App. 1995).

In this case, the documents were not records of events that had occurred in the course of regularly conducted business activity. The documents were prepared to inform customers of Bank's policies and procedures in accordance with policy changes and applicable laws. The documents were offered to establish Customer's knowledge and understanding of

Bank's operating procedures, namely Bank's limitation of liability for unauthorized transactions if Customer failed to review his bank statements. The documents were also offered to establish Bank's compliance with federal regulations. Accordingly, Ms. Hardiman's qualification as a custodian of records was unnecessary for the purpose of admitting the disclosure documents and allowing her to testify about the documents.

The testimony complained of, Ms. Hardiman's assertion that Bank employees are instructed to provide the disclosure documents when the account is opened and that updated disclosure documents were sent with each new card, was derived from the manuals Ms. Hardiman studied during her employment training and her experience as an officer in the security division. Additionally, the testimony was not offered to prove the truth of the matter asserted in the manuals, namely that Bank followed the appropriate procedure on the day that Customer opened his account.[1] Instead, Ms. Hardiman merely testified that Bank provided policies and procedures that *should* have been followed on the day Customer opened his account and each time Bank mailed Customer a replacement or renewal debit card. Such testimony was not hearsay, was relevant, and was properly admitted. With all of the above considerations in mind, we conclude that the preponderance of the evidence supports the trial court's conclusion that Customer received the applicable disclosures.

## II.

Customer argues that he cannot be held liable for the unauthorized transactions because the debit card was not an accepted card or access device. An accepted card is defined as

> a card, code, or other means of access to a consumer's account for the purpose of initiating electronic fund transfers when the person to whom such card or other means of access was issued has requested and received or has signed or has used, or authorized another to use, such card or other means of access for the purpose of transferring money between accounts or obtaining money, property, labor, or services[.]

15 U.S.C. § 1693a(1). Likewise, the CFR provides, in pertinent part,

> (a)(1) Access device means a card, code, or other means of access to a consumer's account, or any combination thereof, that may be used by the consumer to initiate electronic fund transfers.

---

[1]The manuals were also not entered into evidence.

(2) An access device becomes an accepted access device when the consumer:

\* \* \*

> (iii) Receives an access device in renewal of, or in substitution for, an accepted access device from either the financial institution that initially issued the device or a successor.

12 C.F.R. § 205.2(a).

Customer admits that the debit card was a renewal or substitution card but asserts that the card was not an accepted device because Ms. Wehrman intercepted the card from his mailbox, thereby preventing him from actually receiving the card. The testimony presented concerning the place and time in which the card was stolen was speculative, at best. However, Customer admitted that he invited Ms. Wehrman into his home for overnight visits and provided her with unlimited access to his home office and mailbox while he was not present. Ms. Wehrman was not a random passerby that stole Customer's card. She was provided with unrestricted access to Customer's home office and mailbox while Customer was not present. With these considerations in mind, we conclude that Ms. Wehrman's receipt of the debit card, whether obtained from the home office or the mailbox, was sufficient to establish Customer's receipt of the debit card. Accordingly, the preponderance of the evidence supports the trial court's conclusion that the transactions were made with an accepted access device or other means of access.

III.

Customer has seemed to limit his focus on the language that was on a document that the debit card he received in the mail was attached to, this language as noted earlier provided:

> You are protected if your card is ever lost or stolen. You are not responsible for unauthorized purchases.

He seems to overlook the additional language which provides:

> Use of this card is subject to the terms and conditions of your current Customer Agreement.

However, even if our focus in this case was limited to that of Customer and the language he has advanced, Customer still cannot recover because he has violated the implied

-10-

condition of good faith and fair dealing in his contract with Bank. When Customer opened his account with Bank, he entered into a contract. As previously explained by this court,

> Every contract imposes upon the parties a duty of good faith and fair dealing in the performance and interpretation of the contract. *Wallace v. National Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn 1996); RESTATEMENT SECOND OF CONTRACTS § 205 (1979); 2 JOSEPH M. PERILLO & HELEN HADJIYAUUAKIS BENDER, CORBIN ON CONTRACTS § 5.27, at 139 (rev. ed 1995). This duty requires a contracting party to do nothing that will have the effect of impairing or destroying the rights of the other party to receive the benefits of the contract. *Winfree v. Educators Credit Union*, 900 S.W.2d 285, 289 (Tenn. Ct. App. 1995).

*Elliott v. Elliott*, 149 S.W.3d 77, 84-85 (Tenn. Ct. App. 2004). Customer admitted that he failed to review his monthly bank statements for an extended period of time. He also admitted that had he reviewed his monthly bank statements, he would have noticed the unauthorized transactions. By failing to consistently review his bank statements, he impaired Bank's ability to ensure that only authorized transactions were honored and exposed Bank to liability for fraudulent transactions. Accordingly, we conclude that Customer violated the duty of good faith and fair dealing that was implicit in his contract with Bank.

IV.

Lastly, Customer contends that he may not be held liable for the unauthorized transactions because Bank failed to provide a means whereby the user of the debit card could have been identified as the person authorized to use the device. Ms. Hardiman testified that the user of any debit card would have had to enter a PIN or provide a signature when using the card to make a purchase. Accordingly, we reject Customer's contention and conclude that Bank provided the appropriate means to identify the authorized user of the card at issue. Having concluded that Bank provided the pertinent disclosures of liability, that the account was accessed using an accepted device, that Customer violated his implicit duty of good faith and fair dealing, and that Bank provided a means whereby the user could have been identified as the person authorized to use the device, we also conclude that the trial court did not err by holding Customer liable for Ms. Wehrman's unauthorized transactions.

B.

Having determined that Customer may be held liable for the unauthorized transactions, we must review the court's decision regarding the amount of Customer's liability for the unauthorized transactions. Several documents were introduced regarding

-11-

Bank's policy of limiting consumer liability for unauthorized transactions. Two of the three documents also provided that use of the debit card was subject to the terms and conditions of Bank's rules and regulations in the customer agreement, which essentially followed the provisions contained in the USC and CFR. The debit card attached to the third document contained the same caveat. Customer argues that despite the pertinent rules and regulations governing his account, Bank verbally advised him that he was not liable for unauthorized purchases. However, Customer signed a signature card in which he acknowledged that he was governed by Bank's rules and regulations for his account.

Relative to the EFTA, the CFR provides, in pertinent part,

(b) Limitations on amount of liability. A consumer's liability for an unauthorized electronic fund transfer or a series of related unauthorized transfers shall be determined as follows:

(1) Timely notice given. If the consumer notifies the financial institution within two business days after learning of the loss or theft of the access device, the consumer's liability shall not exceed the lesser of $50 or the amount of unauthorized transfers that occur before notice to the financial institution.

(2) Timely notice not given. If the consumer fails to notify the financial institution within two business days after learning of the loss or theft of the access device, the consumer's liability shall not exceed the lesser of $500 or the sum of:

(i) $50 or the amount of unauthorized transfers that occur within the two business days, whichever is less; and

(ii) The amount of unauthorized transfers that occur after the close of two business days and before notice to the institution, provided the institution establishes that these transfers would not have occurred had the consumer notified the institution within that two-day period.

(3) Periodic statement; timely notice not given. *A consumer must report an unauthorized electronic fund transfer that appears on a periodic statement within 60 days of the financial*

*institution's transmittal of the statement to avoid liability for subsequent transfers.* If the consumer fails to do so, the consumer's liability shall not exceed the amount of the unauthorized transfers that occur after the close of the 60 days and before notice to the institution, and that the institution establishes would not have occurred had the consumer notified the institution within the 60-day period. When an access device is involved in the unauthorized transfer, the consumer may be liable for other amounts set forth in paragraphs (b)(1) or (b)(2) of this section, as applicable.

12 C.F.R. § 205.6(b) (emphasis added). Likewise, the USC provides, in pertinent part,

In no event, however, shall a consumer's liability for an unauthorized transfer exceed the lesser of--

(1) $50; or

(2) the amount of money or value of property or services obtained in such unauthorized electronic fund transfer prior to the time the financial institution is notified of, or otherwise becomes aware of, circumstances which lead to the reasonable belief that an unauthorized electronic fund transfer involving the consumer's account has been or may be effected. Notice under this paragraph is sufficient when such steps have been taken as may be reasonably required in the ordinary course of business to provide the financial institution with the pertinent information, whether or not any particular officer, employee, or agent of the financial institution does in fact receive such information.

Notwithstanding the foregoing, reimbursement need not be made to the consumer for losses the financial institution establishes would not have occurred *but for the failure of the consumer to report within sixty days of transmittal of the statement* (or in extenuating circumstances such as extended travel or hospitalization, within a reasonable time under the circumstances) any unauthorized electronic fund transfer or account error which appears on the periodic statement provided to the consumer under section 1693d of this title. In addition, reimbursement need not be made to the consumer for losses which the financial institution establishes would not have occurred but for the failure of the consumer to report any loss or theft of a card or other means of access

-13-

within two business days after the consumer learns of the loss or theft (or in extenuating circumstances such as extended travel or hospitalization, within a longer period which is reasonable under the circumstances), but the consumer's liability under this subsection in any such case may not exceed a total of $500, or the amount of unauthorized electronic fund transfers which occur following the close of two business days (or such longer period) after the consumer learns of the loss or theft but prior to notice to the financial institution under this subsection, whichever is less.

15 U.S.C. § 1693(b) (emphasis added).

Having reviewed the applicable code sections, we note that the USC and the CFR provide three separate tiers of liability. Depending on the circumstances, a consumer may be held liable for $50, $500, or an unlimited amount of the unauthorized transactions if he or she failed to review the pertinent bank statements and timely notify the financial institution. Additionally, more than one tier of liability may apply to the consumer because a tier may be read in conjunction with other tiers. Indeed, the official staff interpretation of the CFR provides, in pertinent part,

The standard of unlimited liability applies if unauthorized transfers appear on a periodic statement, and may apply in *conjunction* with the first two tiers of liability. If a periodic statement shows an unauthorized transfer made with a lost or stolen debit card, the consumer must notify the financial institution within 60 calendar days after the periodic statement was sent; otherwise, the consumer faces unlimited liability for all unauthorized transfers made after the 60-day period. The consumer's liability for unauthorized transfers before the statement is sent, and up to 60 days following, is determined based on the first two tiers of liability: up to $50 if the consumer notifies the financial institution within two business days of learning of the loss or theft of the card and up to $500 if the consumer notifies the institution after two business days of learning of the loss or theft.

12 C.F.R. Pt. 205, Supp. I. (emphasis added).

Ms. Hardiman testified that Bank would have closed the account when Customer reported the unauthorized transactions. Customer acknowledged that he would have recognized the unauthorized transactions if he had reviewed his bank statements. The first periodic statement evidencing an unauthorized transaction was sent on August 31, 2005. Customer did not notify Bank of the unauthorized activity within 60 days of August 31, 2005. Instead, he notified Bank within two days of learning of the theft. Thus, he was liable for

$50 of the transactions that occurred prior to the expiration of the 60-day time period and for the entirety of the transactions that occurred after the expiration of the 60-day time period. Having reviewed the record, we conclude that Bank should have credited Customer's account in the amount of $659.07, taking into account the $50 fee for the transactions that occurred before the statement was sent and within the 60-day time period. Customer acknowledged receipt of $677.46 from Bank. Accordingly, we affirm the trial court's dismissal of the complaint because he received a credit in excess of what he was entitled to receive.

## V. CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Stephen S. Patterson, II.

_____
JOHN W. McCLARTY, JUDGE